1  RONALD RUS, #67369
   rrus@rusmiliband.com
2  LEO J. PRESIADO, #166721
   lpresiado@rusmiliband.com
3  RUS, MILIBAND & SMITH
   A Professional Corporation
4  2211 Michelson Drive, Seventh Floor
   Irvine, California 92612
5  Telephone: (949) 752-7100
   Facsimile: (949) 252-1514
6

7  Attorneys for Defendants
   THUNDERWOOD HOLDINGS, INC.,
8  BRIAN DUNNING, and BRIANDUNNING.COM

9  PATRICK K. McCLELLAN, #077352
   pkellymc@pacbell.net
10 LAW OFFICES OF PATRICK K. McCLELLAN
   2211 Michelson Drive, Suite 700
11 Irvine, CA 92612
   Telephone (949) 261-7615
12
   Attorney for Defendant
13 KESSLER'S FLYING CIRCUS

14

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA - SAN JOSE DIVISION

| | |
|---|---|
| EBAY INC., | )    CASE NO. CV-08-4052 JF |
| Plaintiff, | ) |
| | )    **COMPENDIUM OF EXHIBITS** |
| vs. | )    **IN SUPPORT OF MOTION TO** |
| | )    **DISMISS PLAINTIFF'S SECOND** |
| DIGITAL POINT SOLUTIONS, INC.; | )    **AMENDED COMPLAINT BY** |
| SHAWN HOGAN; KESSLER's FLYING | )    **DEFENDANTS THUNDERWOOD** |
| CIRCUS; THUNDERWOOD HOLDINGS, | )    **HOLDINGS, INC., BRIAN DUNNING,** |
| INC.; TODD DUNNING; DUNNING | )    **AND BRIANDUNNING.COM** |
| ENTERPRISES, INC.; BRIAN DUNNING; | ) |
| BRIANDUNNING.COM; and DOES 1-10, | )    DATE:    June 26, 2009 |
| | )    TIME:    9:00 a.m. |
| Defendants. | )    PLACE:    Courtroom 3, 5th Fl. |
| | )           280 South 1st Street |
| | )           San Jose, CA 95113 |

Honorable Jeremy Fogel presiding

Defendants Kessler's Flying Circus, Thunderwood Holdings, Inc., Brian

Dunning and BrianDunning.com (collectively, the "KFC Defendants") hereby submit the

/ / /

1

367134v1 ts 4/27/09 2 (2785-0002)

Dockets.Justia.com

following Compendium of Exhibits in support of the Motion To Dismiss Plaintiff's Second Amended Complaint filed concurrently herewith:

| EXHIBIT NO. | DESCRIPTION |
|---|---|
| 1 | Order (1) Granting Motions to Dismiss for Improper Venue and (2) Granting In Part Motion to Dismiss for Failure to State a Claim Upon Which Relief May Be Granted, dated February 24, 2009 |
| 2 | Publisher Service Agreement |
| 3 | eBay Affiliate Global T&C October 1, 2005 |
| 4 | eBay's First Request for Admissions served on Defendant KFC |
| 5 | eBay's First Set of Special Interrogatories served on Defendant KFC |
| 6 | eBay's First Request for Documents served on Defendant KFC |
| 7 | eBay User Agreement |
| 8 | Second Amended Complaint with attached Exhibits "A" and "B" filed in Case No. 30-2008 00101025, California Superior Court of the County of Orange, dated May 15, 2008 |
| 9 | Request for Dismissal filed in the State Court Action dated March 23, 2009 |
| 10 | Settlement and Mutual General Release Agreement, which is part of the court record in the State Court Action |
| 11 | Email from Philip Montoya, Esq. To Leo J. Presiado and Stewart Foreman dated October 22, 2008 |

DATED: April 27, 2009

Respectfully submitted,

RUS, MILIBAND & SMITH
A Professional Corporation

By: _____
LEO J. PRESIADO
Attorneys for Defendants
Thunderwood Holdings, Inc., Brian Dunning
and BrianDunning.com

DATED: April 27, 2009

LAW OFFICES OF PATRICK K. McCLELLAN

By: _____
PATRICK K. McCLELLAN
Attorneys for Defendant
Kessler's Flying Circus

2

EXHIBIT "1"

1

2 [**E-Filed 2/24/09**]

3

4

5

6

7

8 **IN THE UNITED STATES DISTRICT COURT**

9 **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

10 **SAN JOSE DIVISION**

11

| | |
|---|---|
| 12 EBAY INC., | Case Number C 08-4052 JF (PVT) |
| 13 Plaintiff, | ORDER[1] (1) GRANTING MOTIONS TO DISMISS FOR IMPROPER VENUE |
| 14 v. | AND (2) GRANTING IN PART MOTION TO DISMISS FOR FAILURE TO STATE |
| 15 DIGITAL POINT SOLUTIONS, INC., SHAWN HOGAN, KESSLER'S | A CLAIM UPON WHICH RELIEF MAY BE GRANTED |
| 16 FLYING CIRCUS, THUNDERWOOD HOLDINGS, INC., TODD DUNNING, | [re: doc. nos. 28-31, 37, 48] |
| 17 DUNNING ENTERPRISES, INC., BRIAN DUNNING, BRIANDUNNING.COM, | |
| 18 and DOES 1-20, | |
| 19 Defendants. | |

20

21

22     Plaintiff eBay Inc. ("eBay") alleges that Defendants Digital Point Solutions, Inc.,

23 Kessler's Flying Circus, Thunderwood Holdings, Inc., Todd Dunning, Todd Dunning

24 Enterprises, Inc., Brian Dunning, BrianDunning.com, and Does 1-20 engaged in a "cookie

25 stuffing" scheme in violation of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. §

26 1030 *et seq.*, and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §

27 ―――――――――――――

28    [1] This disposition is not designated for publication in the official reports.

1   1962(c). eBay's first amended complaint ("FAC") also sets forth multiple state law claims.

2   Defendants move to dismiss the FAC for failure to state a claim upon which relief may be

3   granted, improper venue, and, as to eBay's state law claims, lack of subject matter jurisdiction.[2]

4   For the reasons set forth below, the motions to dismiss for improper venue will be granted with

5   leave to amend, and the motion to dismiss for failure to state a claim will be granted in part with

6   leave to amend. Resolution of the motion to dismiss certain state law claims will be deferred

7   pending amendment of the federal claims.

8                                    **I. BACKGROUND**

9       eBay pays an advertising fee to its marketing affiliates when an advertisement placed by

10  an affiliate on a web page is clicked by a web user. FAC ¶19. The crediting of appropriate

11  advertising fees occurs as follows. When a web user clicks on an advertisement placed by an

12  eBay advertising affiliate, the user's browser is directed to the eBay website. When the user

13  accesses eBay's website, a "cookie" is deposited onto the user's computer. *Id.* at ¶22. This

14  cookie contains information with respect to the referring advertising affiliate and can track

15  whether the user visits eBay again and whether any subsequent visit qualifies as a "revenue

16  action." *Id.* at ¶¶21-22. Revenue actions, which include the user registering with eBay or

17  utilizing the auction service offered by eBay, result in the payment of commissions to the

18  referring advertising affiliate. *Id.* at ¶19. If multiple cookies are present on the user's

19  computer—which may occur if the user has clicked on several different advertisements before

20  engaging in a revenue action—the most recently deposited cookie (and its corresponding

21  advertising affiliate) will be credited for any revenue actions. *Id.* at ¶22.

22      The FAC alleges that each group of Defendants engaged in a cookie stuffing scheme that

23

24  _____

25      [2] Four separate motions to dismiss were filed by the following groups of Defendants: (1)
    Brian Dunning, BrianDunning.com and Thunderwood Holdings, Inc. (collectively, the "Brian
26  Dunning Defendants"); (2) Todd Dunning and Dunning Enterprise, Inc. (collectively, the "Todd
    Dunning Defendants"); (3) Kessler's Flying Circus ("KFC"); and (4) Digital Point Solutions
27  ("DPS") and Shawn Hogan (collectively, the "DPS Defendants"). Where appropriate, groups 1-3
    are referred to herein as the "Non-DPS Defendants." Only the Non-DPS Defendants move to
28  dismiss for improper venue.

                                          2

1    resulted in the improper payment of advertising fees. While the exact method used by

2    Defendants is unknown, eBay surmises that Defendants first placed software code on a web

3    user's computer surreptitiously, without the user's knowledge. FAC ¶25. The software code

4    then directed the user's browser to eBay's website, without the user's knowledge or any

5    affirmative action on the part of the user. *See id.* When the user's web browser accessed eBay's

6    website, Defendants' software code then prompted eBay to deposit a cookie on the user's

7    computer, credited to Defendants as if the user had been referred to eBay via a legitimate

8    advertisement. *Id.* As a result, advertising fees for subsequent revenue actions were credited to

9    Defendants even though the user never clicked on an advertisement. *Id.* at ¶¶25-26, 32. The

10   cookie stuffing displaced legitimate cookies placed by other eBay affiliates. *See id.* at ¶¶22, 32.

11        eBay alleges that Defendants engaged in the above-described activities from at least

12   December 2004 until June 2007. FAC ¶¶ 37-38. In January 2008, Commission Junction, a

13   subsidiary of ValueClick that administers the revenue action payment process for eBay, sued

14   Defendants for breach of contract in Orange Superior Court (the "Commission Junction

15   Action"). Defendants and Commission Junction are parties to a Publisher's Service Agreement

16   ("PSA"), which includes a forum selection clause stating that "[t]he exclusive forum for any

17   actions related to this Agreement shall be in the state courts, and, to the extent that the federal

18   courts have exclusive jurisdiction, in Los Angeles, California." PSA at 5. The issues in the

19   Commission Junction Action arise out of the same conduct alleged in the FAC, with

20   Commission Junction seeking the return of fees paid to several Defendants on the ground that

21   such fees were improperly credited because of the cookie-stuffing scheme described above.

22        eBay initiated the instant action on August 25, 2008 and the FAC was filed on October 7,

23   2008. eBay alleges six claims for relief: (1) violation of the CFAA, (2) violation of RICO, (3)

24   fraud, (4) violation of Cal. Penal Code § 502, (5) unjust enrichment, and (6) violation of Cal.

25   Bus. & Prof. Code § 17200. The FAC refers expressly to a contractual arrangement between

26   eBay and Commission Junction with respect to the operation of the advertising affiliate program,

27   but it does not allege any facts with respect to the PSA.

28

3

## II. LEGAL STANDARD

When considering a motion to dismiss, the plaintiff's allegations are taken as true and the Court must construe the complaint in the light most favorable to the plaintiff. *Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969). For a motion to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6), "[d]ismissal is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Medical Center*, 521 F.3d 1097, 1104 (9th Cir. 2008). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007) (citations omitted).

A motion to dismiss for lack of subject matter jurisdiction may attack the complaint on facial or factual grounds. *See Safe Air For Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). In a facial attack, the moving party asserts that the allegations in the complaint are insufficient on their face to invoke federal jurisdiction. *Id.* In a factual attack, the moving party disputes the truth of the allegations in the complaint, which otherwise would be sufficient to invoke federal jurisdiction. *Id.* In resolving a facial attack, the Court accepts the allegations in the complaint as true. *Whisnant v. United States*, 400 F.3d 1177, 1179 (9th Cir. 2005). In resolving a factual attack, the Court need not presume the truthfulness of the allegations set forth in the complaint and may consider evidence beyond the face of the complaint without converting the motion to dismiss into a motion for summary judgment. *Id.*; *Safe Air*, 373 F.3d at 1039. Once the moving party has presented affidavits or other evidence tending to show that subject matter jurisdiction does not lie, the plaintiff must present affidavits or other evidence sufficient to establish subject matter jurisdiction. *Safe Air*, 373 F.3d at 1039.

A motion to dismiss for improper venue based upon a forum selection clause may be brought pursuant to a Fed. R. Civ. P. 12(b)(3). *See Argueta v. Banco Mexicano, S.A.*, 87 F.3d 320, 323-24 (9th Cir. 1996). In a Rule 12(b)(3) motion, the allegations in the complaint need not be accepted as true and the Court may consider evidence outside the pleadings. *Murphy v.*

4

1 | *Schneider Nat'l, Inc.*, 362 F.3d 1133, 1137 (9th Cir. 2004). If there are any factual disputes with

2 | respect to a forum selection clause, "the trial court must draw all reasonable inferences in favor

3 | of the non-moving party and resolve all factual conflicts in favor of the non-moving party." *Id.* at

4 | 1138. Ultimately, the plaintiff bears the burden of showing that venue is proper. *Piedmont Label*

5 | *Co. v. Sun Garden Packing Co.*, 598 F.2d 491, 496 (9th Cir. 1979).

## III. DISCUSSION

7 | The Non-DPS Defendants argue that the FAC should be dismissed pursuant to Fed. R.

8 | Civ. P. 12(b)(3) for improper venue. The Non-DPS Defendants also contend that the FAC fails

9 | to state a claim under the CFAA or RICO, and that the remaining state law claims thus must be

10 | dismissed for lack of subject matter jurisdiction. The DPS corporate entity moves pursuant to

11 | Fed. R. Civ. P. 12(b)(6) to dismiss the claims under the CFAA and RICO as well as two of the

12 | four state-law claims. Defendant Shawn Hogan seeks dismissal only of the RICO claim.

13 | A. Venue and the Non-DPS Defendants

14 | The FAC alleges that venue is proper under 28 U.S.C. §§ 1391(b)-(c) and 18 U.S.C. §

15 | 1965(a). Pursuant to § 1391(b)(1), a civil action may be brought in any district in which a

16 | defendant resides. A civil action also may be brought in any district "in which a substantial part

17 | of the events or omissions giving rise to the claim occurred." 28 U.S.C. § 1391(b)(2). If the

18 | defendant is a corporation, it is deemed to reside in any district where its contacts would be

19 | sufficient to subject it to personal jurisdiction. 28 U.S.C. § 1391(c). 18 U.S.C. § 1965(a)

20 | provides that a RICO action may be "instituted in the district court of the United States for any

21 | district in which such person resides, is found, has an agent, or transacts his affairs." *See also*

22 | *City of New York v. Cyco.Net, Inc.*, 383 F. Supp. 2d 526, 543 (S.D.N.Y. 2005) ("The RICO

23 | venue provision is supplemental to the general federal venue provision found in 28 U.S.C. §

24 | 1391.") (citations omitted).

25 | In the absence of an enforceable forum selection clause, it is apparent that eBay has

26 | alleged sufficient facts to establish that venue is proper in this district. Defendants' software

27 | code forced web users' browsers to visit eBay's website, resulting in the placement of a cookie

28 | that should not have been deposited. When the users visited eBay's site again and engaged in a

5

1  revenue action, the improperly credited cookie caused eBay to pay Defendants for the revenue

2  action. These events are sufficient to establish personal jurisdiction under § 1391(b)(2), as some

3  or all of the predicate acts underlying eBay's claims are alleged to have occurred in this district.

4  The test for venue over a corporation under § 1391(b)(1) essentially mirrors the test for personal

5  jurisdiction. 28 U.S.C. § 1391(c); *Jonathan Browning, Inc. v. Venetian Casino Resort, LLC*, No.

6  C 07-3983, 2007 WL 4532214, at *5-6 (N.D. Cal. Dec. 19, 2007) ("A corporation resides in any

7  jurisdictional district in which it is subject to personal jurisdiction."). The Court concludes that

8  the corporate Defendants are subject to personal jurisdiction because of the multiple alleged

9  contacts with eBay's computer system in this district. *See id.* at 6. The alleged harm that

10  resulted from such contacts also occurred in this district because the advertising affiliate data

11  maintained by eBay was corrupted by Defendants' software code.

12      However, the Non-DPS Defendants argue that eBay is bound by the forum selection

13  clause set forth in the PSA. A forum selection clause is presumed to be valid and enforceable

14  absent a showing that "enforcement would be unreasonable and unjust, or that the clause was

15  invalid for such reasons as fraud or overreaching." *M/S Bremen v. Zapata Off-Shore Co.*, 407

16  U.S. 1, 15 (1972). eBay does not contest the validity of the clause; rather, it asserts that it is not

17  bound by the clause because it is not a signatory to the PSA. In response, Defendants argue that

18  eBay is bound by the PSA as a third-party beneficiary.

19      In the Ninth Circuit, a third-party beneficiary of an agreement is bound by the terms of

20  the agreement, including a valid forum selection clause. *TAAG Linhas Aereas de Angola v.*

21  *Transamerica Airlines, Inc.*, 915 F.2d 1351, 1354 (9th Cir. 1990) ("it is well-settled contract law

22  that the scope of a third-party beneficiary's rights is defined by the contract...a forum selection

23  clause can restrict a third-party beneficiary to the designated forum."). Defendants argue that

24  while eBay may not be an actual signatory to the PSA, eBay does enter into a supplemental

25  Terms and Conditions ("T&C") Agreement with advertising affiliates. The T&C Agreement

26  appears to supplement the PSA, reciting in relevant part as follows:

27

28

6

1
2
3
4
5

> In consideration for Your participation in the Affiliate Program (the "Program") maintained by eBay Inc. ("eBay") through Commission Junction ("CJ"), You agree to comply with these Supplemental Terms and Conditions ("Terms and Conditions") in addition to the terms of the Commission Junction Publisher Service Agreement ("PSA"). If any of these Terms and Conditions conflict with those of the PSA, then these Terms and Conditions will control. Capitalized terms not defined herein have the meanings set forth in the PSA.

6   Foreman Decl. Ex. 2. This language in the T&C Agreement, when read together with eBay's

7   own allegations in the FAC with respect to the role of the PSA, indicates that eBay is a third-

8   party beneficiary of the PSA. Pursuant to the PSA, advertising affiliates earn revenue by

9   "promoting Advertisers," including eBay. *See* PSA at 1. Indeed, the T&C Agreement appears

10  expressly to incorporate the terms of the PSA. *See Prouty v. Gores Tech. Group*, 121 Cal. App.

11  4th 1225, 1232 (2004) ("The test for determining whether a contract was made for the benefit of

12  a third person is whether an intent to benefit a third person appears from the terms of the

13  contract.") (citation omitted).

14      At oral argument, eBay contended that a separate "user agreement" supersedes the forum

15  selection clause of the PSA. *See* Hr'g Tr. 25-26, Dec. 12, 2008. However, the FAC does not

16  explain how violation of the user agreement is unrelated to the alleged breach of the PSA or why

17  the PSA should not be considered the primary and controlling agreement for all claims related to

18  the PSA. Moreover, the FAC only alleges that individual Defendants Shawn Hogan, Brian

19  Dunning, and Todd Dunning entered into the user agreement. *See* FAC ¶35. Accordingly, while

20  eBay has met its burden of showing that venue would be proper in this district in the absence of

21  an applicable forum selection clause, it has failed to present sufficient allegations as to why it is

22  not bound by the forum selection clause contained in the PSA. The Central District of California

23  and/or the Los Angeles Superior Court would provide an alternate and viable forum to bring

24  claims against the Non-DPS Defendants. *See Murphy*, 362 F.3d at 1141-43. Accordingly, the

25  motion to dismiss by the Non-DPS Defendants for improper venue will be granted, with leave to

26
27
28

7

1  amend.[3]  Because the Court finds that dismissal of the FAC with respect to the Non-DPS

2  Defendants is proper under Rule 12(b)(3), it does not consider the other motions brought by these

3  Defendants.

4      B.  Alleged Violation of CFAA by the DPS Corporate Entity

5      Under the CFAA, civil liability may be imposed where a defendant

6          [K]nowingly and with intent to defraud, accesses a protected
           computer without authorization, or exceeds authorized access, and
7          by means of such conduct furthers the intended fraud and obtains
           anything of value. . . (18 U.S.C. § l030(a)(4)); or

8
9          [I]ntentionally accesses a protected computer without
           authorization, and as a result of such conduct, recklessly causes
10         damage (18 U.S.C. § 1030(a)(5)(B)); or

11         [I]ntentionally accesses a protected computer without
           authorization, and as a result of such conduct, causes damage and
12         loss (18 U.S.C. § 1030(a)(5)(C)); and

13         [C]auses loss to one or more persons during any 1-year
           period…aggregating at least $5,000 in value (18 U.S.C. §
14         1030(c)(4)(A)(i)(I)).

15 *See also Ticketmaster L.L.C. v. RMG Techs., Inc.*, 507 F. Supp. 2d 1096, 1113 (C.D. Cal. 2007).

16     The instant case appears to be one of first impression with respect to the application of

17 the CFAA to a cookie stuffing scheme.  As an initial matter, the use of a third party's computer

18 to access a website, rather than one's own computer, does not prevent a claim under the CFAA.

19 *See Binary Semantics Ltd. v. Minitab, Inc.*, 07-CV-1750, 2008 WL 763575, at *5 (M.D. Pa. Mar.

20 20, 2008) (concluding that the CFAA applies to defendant who controlled actions of person who

21 allegedly accessed a protected computer).  Such a conclusion comports with reality, as hackers

22 may use the computers of unknowing third parties to carry out their schemes.  *See, e.g., U.S. v.*

23 *Ancheta*, Case No. CR 05-1060 (C.D. Cal.) (hacker admitted using third-party computers as

24

25

26     [3] It would be premature for the Court to determine whether eBay's claims, which

27 essentially are tort claims, are covered by a clause relating to breach of contractual obligations.
   However, similarly-worded forum selection clauses have been interpreted to cover related tort

28 actions. *See Manetti-Farrow, Inc. v. Gucci Am.,* Inc., 858 F.2d 509, 514 (9th Cir. 1988).

Case No. C 08-4052 JF (PVT)
ORDER GRANTING MOTIONS TO DISMISS ETC.
(JFLC1)

1  "zombies" to carry out spam operations and denial of service attacks).[4] DPS argues that even if it

2  directed a user's computer to the eBay website, such access by the user's computer was not

3  "without authorization," as eBay is a public website that may be accessed by anyone and thus is

4  not a "protected computer" within the meaning of the CFAA.

5      In response, eBay argues that "[DPS's] access of eBay's computers was unauthorized

6  because the only purpose of that access was to defraud eBay." FAC ¶35. Allegations with

7  respect to access and use beyond those set forth in a user agreement constitute unauthorized use

8  under the CFAA. *See Am. Online, Inc. v. LCGM, Inc.*, 46 F. Supp. 2d 444, 450 (E.D. Va. 1998)

9  ("Defendants' actions violated [the] Terms of Service, and as such was unauthorized."). In

10  addition, Defendant Shawn Hogan has not moved to dismiss the CFAA claim, presumably

11  because the FAC alleges that he did enter into a formal user agreement and violated the terms of

12  that agreement (and the CFAA) by engaging in the alleged cookie stuffing scheme.[5] While DPS

13  argues it could not have violated the user agreement because it never entered into any such

14  agreement with eBay, eBay alleges explicitly that DPS caused users to access eBay's website

15  solely to corrupt eBay's advertising affiliate data. For purposes of a Rule 12(b)(6) motion, such

16  allegations are sufficient to support a claim of unauthorized access in violation of the CFAA. In

17  addition, "fraud" under the CFAA only requires a showing of unlawful access; there is no need to

18  plead the elements of common law fraud to state a claim under the Act. *See Hanger Prosthetics*

19  *& Orthotics, Inc. v. Capstone Orthopedic, Inc.*, 556 F. Supp. 2d 1122, 1131 (E.D. Cal. 2008)

20  ("The term 'defraud' for purposes of § 1030(a)(4) simply means wrongdoing and does not

21  require proof of common law fraud."). Accordingly, eBay has sufficiently alleged that DPS

22

23  _____

24      [4] The scope of the CFAA has been expanded considerably by Congress, and the statute
now is applied broadly to "punish those who illegally use computers for commercial advantage."
25  *Shurgard Storage Centers, Inc. v. Safeguard Self Storage, Inc.*, 119 F. Supp. 2d 1121, 1129
26  (W.D. Wash. 2000) (citing S. Rep. No. 104-357 (1996)).

27      [5] A registered eBay user must agree to eBay's "User Agreement," which prohibits the use
of "any device, software or routine" that interferes with the normal operation of eBay's website
28  and requires compliance with all applicable law. FAC ¶35.

1  engaged in conduct prohibited by the CFAA.[6]

2      C. Alleged RICO violations by DPS Defendants

3      "To state a claim under § 1962(c), a plaintiff must allege '(1) conduct (2) of an enterprise

4  (3) through a pattern (4) of racketeering activity.'" *Odom v. Microsoft Corp.*, 486 F.3d 541, 547

5  (9th Cir. 2007) (quoting *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985). The DPS

6  Defendants argue that the FAC fails to plead the enterprise element adequately, as the DPS

7  corporate entity did not come into existence until May 2007 and thus cannot satisfy the

8  "enterprise" element. DPS also contends that the FAC fails to establish an association-in-fact

9  enterprise because the FAC names only Does 1-10 with Shawn Hogan in an attempt to plead a

10  RICO association.

11      RICO defines "enterprise" to include "any individual, partnership, corporation,

12  association, or other legal entity, and any union or group of individuals associated in fact

13  although not a legal entity." 18 U.S.C. § 1961(4). An enterprise need not be exclusively

14  criminal in nature to come under the auspices of RICO. *U.S. v. Turkette*, 452 U.S. 576, 580-81

15  (1981). Instead, an enterprise need only be an "ongoing organization, formal or informal," so

16  long as the organization functions as a "continuing unit." *Odom*, 486 F.3d at 552 (quoting

17  *Turkette*, 452 U.S. at 583). "A single 'individual' is an enterprise under RICO. Similarly, a

18  single 'partnership,' a single 'corporation,' a single 'association,' and a single 'other legal entity'

19  are all enterprises." *Id.* at 549.

20      eBay alleges that the cookie stuffing scheme constituted the predicate act of mail and wire

21  fraud under 19 U.S.C. § 1343. *See* FAC ¶45. In the Ninth Circuit, a RICO claim predicated on

22

23      [6] DPS requests judicial notice of articles of incorporation filed with the Secretary of State

24  on May 14, 2007. The Court will take judicial notice of the fact that the corporate entity known
   as Digital Point Solutions, Inc. filed articles of incorporation on that date. However, the

25  existence of the articles of incorporation does not establish that DPS or any alter ego to DPS did
   not exist in any form prior to May 14, 2007. *See Lee v. City of Los Angeles*, 250 F.3d 668, 689-

26  90 (9th Cir. 2001). Moreover, even if DPS did not exist until May 2007, the alleged activity
   occurred through June 2007, and thus sufficient time passed for eBay to state a claim under the

27  CFAA. *See EF Cultural Travel BV v. Explorica, Inc.*, 274 F.3d 577, 580 (two instances of

28  unauthorized access are sufficient to state a claim under the CFAA).

1   mail fraud is subject to the heightened pleading requirements of Fed. R. Civ. P. 9(b), which

2   requires that fraud be pled with particularity. *Lancaster Cmty. Hosp. v. Antelope Valley Hosp.*

3   *Dist.*, 940 F.2d 397, 405 (9th Cir. 1991). The FAC fails to meet this standard. It alleges that

4   "Defendant Shawn Hogan and DOES 1-10 (the 'Hogan Group') engaged in activities through the

5   company Digital Point Solutions, Inc., which constitutes an enterprise under RICO. Through

6   Digital Point Solutions, Inc., the Hogan Group associated with each other and others for the

7   common purpose of defrauding eBay of commission fees by designing and implementing the

8   cookie stuffing scheme described above." FAC ¶43. It is unclear from the FAC whether eBay is

9   alleging that the Hogan Group was associated with the DPS corporate entity at all relevant times

10  or only during certain periods (for example from the incorporation of DPS in May 2007 through

11  the termination of the enterprise in June 2007). While eBay theorizes that the Hogan Group may

12  have constituted a separate association-in-fact enterprise for certain time periods, the FAC does

13  not set forth this theory in sufficient detail. *See Lancaster Cmty. Hosp.*, 940 F.2d at 405 (a RICO

14  claim should "detail with particularity the time, place, and manner of each act of fraud, plus the

15  role of each defendant in each scheme."). Nor does the FAC cite any specific incidents of

16  suspected cookie-stuffing activity by any Defendant. A pattern of activity should be pled with

17  specificity in order to state a claim under RICO. *See id.* Accordingly, the motion to dismiss the

18  RICO claim will be granted, with leave to amend.

19      D. State Law Claims

20      The DPS corporate entity also seeks dismissal of eBay's state law claims for fraud and

21  violation of Cal. Penal Code § 502. The underlying basis for both claims is the fraudulent cookie

22  stuffing scheme. Under Ninth Circuit case law, these claims are subject to the pleading

23  requirements of Rule (9)(b). *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103-04 (9th Cir.

24  2003) ("Rule 9(b) applies to 'averments of fraud' in all civil cases in federal district

25  court...[where] the claim is said to be 'grounded in fraud' or to 'sound in fraud'...the pleading of

26  that claim as a whole must satisfy the particularity requirement of Rule 9(b)."). For the reasons

27  set forth above, eBay's third and fourth causes of action against the DPS corporate entity will be

28  dismissed, with leave to amend.

11

1

## IV. ORDER

2     Good cause therefor appearing, IT IS HEREBY ORDERED that the motions of the Non-DPS

3     Defendants to dismiss for improper venue are GRANTED, with leave to amend, and the motion of

4     the DPS Defendants to dismiss for failure to state a claim upon which relief may be granted is

5     GRANTED IN PART, with leave to amend.[7]  Any amended complaint shall be filed within thirty

6     (30) days of the date of this order.

7

8

9     DATED:  February 24, 2009

10

11

12     _____
       JEREMY FOGEL
13     United States District Judge

14

15

16

17

18

19

20     _____

21          [7] As noted by the Court at oral argument, the issues raised by Defendants also may be
       resolved in the alternative through a motion to transfer pursuant to 28 U.S.C. § 1404(a).  *See*
22     *Pratt v. Silversea Cruises, Ltd., Inc.*, No. C 05-0693, 2005 WL 1656891, at *5 (N.D. Cal. July
       13, 2005) (§ 1404(a) is appropriate procedural mechanism for transfer based upon a forum
23     selection clause); *Digital Envoy, Inc. v. Google, Inc.*, 319 F. Supp. 2d 1377, 1378-79 (N.D. Ga.
       2004) ("28 U.S.C. § 1404(a) ordinarily controls a party's request to apply a contractual
24     forum-selection clause.").  The initial brief submitted by the Todd Dunning Defendants
25     mentioned § 1404(a) in passing as an "alternativ[e]" to granting the motion to dismiss, but such a
       statement is insufficient for a formal motion to transfer.  *See* Civ. L.R. 7-2.  Any Defendant in the
26     instant case, including the DPS Defendants, may move at any time to transfer under § 1404(a) if
       the circumstances of the instant action favor transfer for the convenience of the parties or the
27     interest of justice.  *See also Schwilm v. Holbrook*, 661 F.2d 12, 16 (3d Cir. 1981) ("Section
       1404(a) does not include a time limitation.").
28

12

Case No. C 08-4052 JF (PVT)
ORDER GRANTING MOTIONS TO DISMISS ETC.
(JFLC1)

1   This Order was served on the following persons:

2

3   Colleen M. Kennedy    ckennedy@omm.com, arofkahr@omm.com

4   David R. Eberhart    deberhart@omm.com, modonnell@omm.com, smeblin@omm.com

5

6   Leo J. Presiado    lpresiado@rusmiliband.com, rradford@rusmiliband.com

7   Patrick Kelly McClellan    pkellymc@pacbell.net

8

9   Seyamack Kouretchian    seyamack@coastlawgroup.com, rcampbell@coastlawgroup.com, sbrill@coastlawgroup.com

10

11  Sharon M. Bunzel    sbunzel@omm.com, rgonzalez@omm.com

12  Stewart H. Foreman    foreman@freelandlaw.com, johnson@freelandlaw.com

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

13

EXHIBIT "2"

This Publisher Service Agreement ("Agreement") is made by and agreed to between Commission Junction, Inc., a Delaware corporation, located at 530 East Montecito Street, Santa Barbara, CA 93103, USA ("CJ"), and you ("You"). As an application service provider, CJ facilitates "Performance Marketing Programs" by providing services ("Network Service") via the Internet. A "Performance Marketing Program" ("Program") is where a person, entity, affiliate or its agent, operating "Web site(s)" (internet domain, or a portion of a domain) and/or other promotional methods to drive traffic to another's Web site or Web site content ("Publisher") may earn financial compensation ("Payouts") for "Transactions" (actions by Visitors as defined by the Advertiser) referred by such Publisher via an action made by a "Visitor" (any person or entity that is not the Publisher or the Publisher's agent) through an Internet connection ("Link") to a Web site or Web site content operated by another person or entity ("Advertiser") from an Advertiser authorized promotional method used by such Publisher. The Advertiser compensates the Publisher, in accordance with this Agreement and the Program Payout specifications.

## 1. Participation in Programs.

(a) **Acceptance by Advertiser.** During this Agreement You may apply to Advertiser Programs for the opportunity to earn Payouts by promoting Advertisers in accordance with the Advertiser's Program terms and complying with this Agreement. Upon approval by the Advertiser for acceptance into its Program, You may display (and remove) Links to Advertiser's Web site or Web site content in accordance with the Advertiser's Program terms and this Agreement. An Advertiser's acceptance of You extends only to the entity, or individual, that enters into this Agreement with CJ.

(b) **Program Terms.** The details of an Advertiser's Program shall be available through the Network Service. Transactions qualifying for a Payout are defined by the Advertiser. Advertisers may change any Payout rate upon no less than 7 days written notice through the Network Service with effect from the 8th day (or such later date as specified by Advertiser).

(c) **Additional Terms.** Publishers and Advertisers may enter into direct contractual relationships through the apply to join process in the form of a click-through agreement hosted by CJ ("Click-through Agreement") or in the form of an offer made to You by Advertiser via the members' area on the Network Service ("Offer"). It is Your obligation to review and accept or decline a Click-through Agreement or Offer when such is presented to You. If accepted by You, compliance with the Click-through Agreement or Offer is solely Your responsibility. The terms and conditions of the Click-through Agreement or Offer may supersede or conflict with this Agreement and shall apply only with respect to Your relationship with that particular Advertiser.

(d) **Prohibited Uses of Links.**

   (i) **Locations.** You may not place Links to an Advertiser's Web site or Web site content in third party newsgroups, message boards, blogs, unsolicited email and other types of spam, link farms, counters, chatrooms, or guestbooks. Publishers using IRC channels, instant messages or similar Internet resources must designate their program as special requiring manual review and acceptance by the Advertiser.

   (ii) **Non-Bona Fide Transactions.** You must promote Advertisers such that You do not mislead the Visitor, and such that the Links deliver bona fide Transactions by the Visitor to Advertiser from the Link. You shall not cause any Transactions to be made that are not in good faith, including, but not limited to, using any device, program, robot, iframes, or hidden frames. You may or may not be compensated for Transactions where You or Your agent are the Visitor. Multiple Leads from the same individual, entity or IP address may be considered non-bona fide Transactions. You shall not earn Payouts for non-bona fide Transactions.

   (iii) **Infringement.** None of Your promotional activities may infringe an Advertiser's proprietary rights (including but not limited to trademark rights), CJ's proprietary rights, or a third party's proprietary rights.

(e) **Updating Links.** If Links to Advertiser are not dynamically updated through the Network Service, upon notification You are obligated to update an Advertiser's Links in order to earn Payouts.

## 2. Publisher Obligations to CJ.

(a) **Accurate, Up-to-Date Information.** You agree to provide CJ and Advertiser with accurate information about You and Your promotional methods, and to maintain up-to-date "Account" information (such as contact information, Web sites used, etc.). In Your Account, You must accurately, clearly and completely describe all promotional methods by selecting the appropriate descriptions and providing additional information when necessary. Some promotional methods will be designated by the system as "special". Special programs are linked to promotional methods and practices considered unique and require manual approval and acceptance by the Advertiser. CJ reserves the right to define any program as special.

(b) **Use of Links.** You represent and warrant that all promotional means used by You will not contain objectionable content (including but not limited to content that is misleading, libelous, defamatory, obscene, violent, bigoted, hate-oriented, illegal, and/or promoting illegal goods, services or activities), and that You will not mislead others. You agree to: (i) use ethical and legal business practices, (ii) comply with the Advertisers' Program terms and this Agreement, (iii) maintain a privacy policy on Your Web site and for any non-Web site based promotional method made available to Visitors, and (iv) designate Your Publisher Account as "special" if You promote an Advertiser(s) by any means other than displaying a Link to the Advertiser on Your Web site. CJ must approve all of Your promotional activities and may deem Your promotional activities inappropriate and a material breach of this Agreement in CJ's sole discretion. Our network quality department reviews publisher conduct and any suspected fraudulent, abusive or

otherwise illegal content or activity by You through Your promotional methods, or that is perpetrated through use of the Network Service, is grounds for immediate termination of this Agreement or deactivation of Your Account.

(c) **Promotional Methods.** You represent and warrant that You will not engage in and/or facilitate spamming, indiscriminate advertising or unsolicited commercial email or otherwise fail to comply with the CAN SPAM Act of 2003 (Public Law 108-187 or any successor legislation), and/or any other laws and/or regulations that govern email marketing and/or communications. You represent and warrant that You will not engage in pop-up or pop-under advertising using any means involving third party properties and/or services (software). Pop up/unders are acceptable on a first party basis only when triggered by Your site content /site visit or by downloadable software applications for which You are the owner/operator. Pop up/unders delivered through downloadable software cannot engage in means that force clicks or perform redirects, or pop over a pay-per-click listing or natural search results. Pop up/unders must honor the CJ Publisher Code of Conduct requirements (as such requirements may be modified from time to time), including but not limited to: (i) installation requirements, (ii) enduser agreement requirements, (iii) afsrc=1 requirements, (iv) requirements prohibiting usurpation of a Transaction that might otherwise result in a Payout to another Publisher (e.g. by purposefully detecting and forcing a subsequent click-through on a link of the same Advertiser) and (v) non-interference with competing advertiser/ publisher referrals.

(d) **Personally Identifiable Information of Visitors.** You represent and warrant that You will not enable the Tracking Code to collect personally identifiable information of Visitors that would allow CJ to personally identify Visitors.

(e) **Privacy.** You must conspicuously post Your privacy policy on Your Web site and otherwise make it available to all Visitors. Your privacy policy must comply with all laws and regulations regarding the privacy of Visitor information, be commercially reasonable, and fully and accurately disclose Your collection and use of Visitor information. You must fully and accurately disclose Your use of third party technology, including CJ's tracking technology, use of cookies and options for discontinuing use of such cookies.

(f) **Applicable Codes and Code Maintenance.** In order for CJ to record the tracking of Visitors' Transactions resulting from clicks on Links to Advertisers promoted by You, You must include and maintain a CJ "Tracking Code" within the Advertiser's Links. All Advertiser Links and all advertisements ("Ad Content") must be in a Network Service compatible format.

(g) **Usage and Security of Account.** You shall be responsible for all usage and activity on Your account and for loss, theft or unauthorized disclosure of Your password (other than through CJ's negligent or willful conduct or omission). You shall provide CJ with prompt written notification of any known or suspected unauthorized use of Your Account or breach of the security of Your Account.

## 3. CJ's Services.

(a) **Tracking Transactions and Payouts.** CJ shall determine (where possible) actual Payouts that should be credited to Your Account. CJ may, in CJ's sole discretion, apply an estimated amount of Payouts, if: (i) You are referring Visitors to Advertiser as verified by clicks through Links to Advertiser with CJ Tracking Code, (ii) where there is an error in Advertiser's transmission of Tracking Code data to CJ, and (iii) where CJ is able to utilize a historical analysis of Your promotion of Advertiser to determine an equitable amount of estimated Payouts.

(b) **Charge-backs.** An Advertiser may apply, or CJ may apply, a debit to Your Account in an amount equal to a Payout previously credited to Your Account in circumstances of : (i) product returns; (ii) duplicate entry or other clear error; (iii) non-bona fide Transactions; (iv) non-receipt of payment from, or refund of payment to, the Visitor by the Advertiser; or (v) Publisher failure to comply with Advertiser's Program terms or other agreement with Advertiser ("Charge-back"). Charge-backs may be applied to Your Account at any time, including previous payment cycles.

(c) **Access to Tracking and Reporting Tools.** CJ shall provide You with access to tracking and reporting tools, and to support services. From time to time CJ may offer optional services for a fee. Fees for such optional services are at CJ's then-current published rates or as may be quoted by CJ, and are payable in advance or may be off-set against Your positive Account balance (at CJ's discretion). Tracking detail regarding Visitor Transactions is not available on a real-time basis for all Advertisers and there may be reporting delays regarding Transactions for some Advertisers. CJ may make available, for fees that CJ shall publish from time-to-time, enhanced reporting capabilities and other services that are not included in the standard Network Service.

(d) **Support.** Support for your program is available on-line through the "Contact Us" area in the CJ Account Manager, which allows You to categorize and describe Your issue. Online help also allows You to check the status of all issues through the "Check Question Status" feature. Phone support may also be available during operating hours, except holidays.

(e) **Facilitating Payment of Payouts.** Subject to other provisions in this Agreement, CJ shall credit Your Account with a Payout for each qualifying Transaction in accordance with the Advertiser's Payout rate and Program terms for the relevant Transaction. On the 20th day of each calendar month, CJ will issue to You any positive balance in Your Account for Transactions reported for the previous month, provided Your Account balance exceeds the required "Minimum Account Balance." CJ shall have no obligation to make payment of any Payouts for which CJ has not received payment from the relevant Advertiser of all monies due to CJ (including for all Payouts owed by such Advertiser to all of such Advertiser's Publishers). If CJ elects, in its own discretion, not to make payment to You for amounts not received from an Advertiser, those amounts shall not be included in the Minimum Balance Amount. Your recourse for any earned Payouts not paid to You shall be to make a claim against the relevant Advertiser(s), and CJ disclaims any and all liability for such payment. You may elect to receive payment in any of the currencies that CJ supports (as may be amended by CJ). The conversion rate shall be determined in accordance with CJ's operating standards using the rates prevailing upon the date that payment is made to You, or upon the basis of historical

conversion rates if rates are unavailable. The number or amount of Transactions, credits for Payouts, and debits for Charge-backs, as calculated by CJ, shall be final and binding on You.

(f) **Dormant Accounts.** If Publisher's Account has not been credited with a valid, compensable Transaction that has not been Charged-back during any rolling, six consecutive calendar month period ("Dormant Account"), a dormant account fee at CJ's then-current rate shall be applied to Publisher's Account each calendar month that Publisher's Account remains an open yet Dormant Account or until Your Account balance reaches a zero balance, at which time the Account shall become deactivated. Transactions will not be counted if the Transaction subsequently becomes a Charge-back.

(g) **Negative Accounts.** You may have a negative balance if Your Account is debited amounts equivalent to previous Payouts for Charge-backs and You do not have an adequate Account balance to cover the Charge-back amounts. When You have a negative balance, You must immediately remit payment to CJ in an amount sufficient to bring Your Account to a zero balance, or Your Account is subject to 1.5% interest per month, compounded monthly.

### 4. Proprietary Rights.

(a) **Linking to Advertisers.** For each Advertiser's Program that You have been accepted to, the Advertiser is granting to You the right to display and Link to the Advertiser's Web site or Web site content in accordance with the Advertiser's Program terms for the limited purposes of Promoting the Advertiser's Program, subject to the terms and conditions of this Agreement. Your use of the Link signifies Your agreement to refrain from copying or modifying any icons, buttons, banners, graphics files or content contained in the Link, including but not limited to refraining from removing or altering any copyright or trademark notices. As between CJ and Publisher, CJ owns all rights in and to all information regarding the Visitors that You refer to Advertisers through CJ.

(b) **CJ's Use of Your Marks.** You authorize CJ to utilize Your trademarks, service marks, tradenames, and/or copyrighted material that You provide to CJ through Your Account to promote Your participation in the Network Services.

(c) **Your Use of CJ's Proprietary Rights.** You agree that Your use of any CJ Web site (such as www.cj.com) and Your use of any CJ trademarks, service marks, tradenames, and/or URLs is subject to the license and terms of use that are available from such Web site ("Terms of Use"). You explicitly agree not to adopt or use in any manner any trademarks, service marks, tradenames, and/or URLs that are the same or confusingly similar to, or are combined with, those of CJ.

(d) **Retention of Rights.** All proprietary rights of Advertisers, You, and CJ, and all goodwill arising as a result of such rights, inure to the benefit of such owner.

(e) **No Challenge to CJ's/Advertiser's Proprietary Rights.** You acknowledge that You obtain no proprietary rights in CJ's trademarks, service marks, tradenames, URLs, copyrighted material, patents, and patent applications, and agree not to challenge CJ's proprietary rights. You acknowledge that You obtain no proprietary rights in Your Advertisers' proprietary rights, and agree not to challenge such Advertiser's proprietary rights.

### 5. Confidentiality.

(a) **Obligations.** You or CJ may provide the other with information that is confidential and proprietary to that party or a third party, as is designated by the disclosing party or that is reasonably understood to be proprietary and/or confidential ("Confidential Information"). The receiving party agrees to make commercially reasonable efforts, but in no case no less effort than it uses to protect its own Confidential Information, to maintain the confidentiality of and to protect any proprietary interests of the disclosing party. Confidential Information shall not include (even if designated by a party) information: (i) that is or becomes part of the public domain through no act or omission of the receiving party; (ii) that is lawfully received by the receiving party from a third party without restriction on use or disclosure and without breach of this Agreement or any other agreement without knowledge by the receiving party of any breach of fiduciary duty, or (iii) that the receiving party had in its possession prior to the date of this Agreement. Upon termination of this Agreement, You must destroy or return to CJ any Confidential Information provided by CJ to You under this Agreement.

(b) **Provision of Info to Advertisers/Third Parties.** You agree that CJ may, but is not obligated to, provide Your email address(es) and basic Publisher Account detail (including but not limited to Your address, phone and fax number, Web site name, the date the website or subscription email first entered into operation, and visitor demographics) to Advertisers. CJ may provide any and all Visitor, Transaction and/or Tracking Code data to the Advertiser to which You referred such Visitor, and to any third party in CJ's sole discretion, including but not limited to all regulatory, legislative and judicial bodies, and pursuant to allegations and claims of proprietary rights infringement. CJ reserves the right to be able to utilize Tracking Code data provided to it, which may include: information about Your performance statistics, to analyze Network Service trends, monitor Network Service efficiencies, maintain the integrity of the tracking code, promote Network Service capabilities and efficiencies, and promote You and Your Web performance to Advertisers.

### 6. Term, Termination, Deactivation and Notices.

(a) **Term.** This Agreement shall commence upon Your indication that You have accepted this Agreement by providing the required information and 'clicking through' the acceptance button on the CJ Web site and shall continue until terminated in accordance with the terms of this Agreement. This Agreement may be terminated by either party upon 15 days notice. This Agreement may be terminated immediately upon notice for Your breach of this Agreement. Your Account may be deactivated during investigation of breach of this Agreement. If this Agreement is

terminated based upon Your breach, You shall not be eligible to enter into a new click-through Publisher Service Agreement with CJ, and any attempt to do so shall be null and void.

(b) **Termination by Advertiser.** An Advertiser may terminate You, one of Your Web sites, or Your ability to use a promotional method, from the Advertiser's Program for any or no reason, upon 7 days written notice with effect from the 8th day. Additionally, Advertiser may terminate You from the Advertiser's Program for breach of a third party's proprietary rights, and/or diluting, tarnishing or blurring an Advertiser's trademarks, tradenames, and/or service marks, or for Your material breach of the Advertiser's Program terms or of this Agreement.

(c) **Termination or Deactivation by CJ.** CJ may terminate You, one of Your Web sites, or Your use of a promotional method, from an Advertiser's Program, at any time in CJ's sole discretion. Breach of any Section of this Agreement is cause for immediate termination from an Advertiser's Program and/or termination of this Agreement, and may result in Chargeback of one or more Payouts. CJ may temporarily deactivate or terminate Your Account if: (i) You or Your agent are responsible for the improper functioning of Ad Content, or if You otherwise interfere with and/or fail to maintain the Tracking Code; (ii) Your Account has not been logged into and/or there have been no Transactions credited to Your Account for any 30 day period; (iii) You maintain a negative balance in Your Account; (iv) CJ determines You are diluting, tarnishing or blurring CJ's proprietary rights; (v) You begin proceedings to challenge CJ's proprietary rights; or (vi) a third party (including a CJ Advertiser) disputes Your right to use any Link, domain name, trademark, service mark, trade dress, or right to offer any service or good offered on Your Web site, or through any of Your promotional means. Upon termination of this Agreement, or in case of deactivation of Your Account, You shall no longer accrue Payouts in Your Account, including but not limited to subsequent sales and/or Leads for click-throughs that occurred prior to termination.

(d) **Termination of Programs and Offers.** Programs and Offers may be discontinued at any time.

(e) **Notices.** Except as provided elsewhere herein, both parties must send all notices relating to this Agreement to: (i) for CJ, via registered mail, return receipt requested or via an internationally recognized express mail carrier to Commission Junction, Inc., Attn: Legal Dept., 530 East Montecito Street, Santa Barbara, CA 93103 USA (effective upon actual receipt); and, (ii) for You, at the email or physical address listed on Your Account (effective upon sending as long as CJ does not receive an error message regarding delivery of the email) or five (5) days after mailing).

(f) **Post-termination.** Upon termination of this Agreement, any outstanding payments shall be paid by CJ to You within 90 days of the termination date, and any outstanding debit balance shall be paid by You to CJ within 30 days of termination of this Agreement. All payments are subject to recovery for Charge-backs. Upon termination of this Agreement, any permissions granted under this Agreement will terminate, and You must immediately remove all Links to Advertiser(s). Provisions of this Agreement that by their nature and context are intended to survive the termination of this Agreement shall survive the termination of this Agreement to the extent that and as long as is necessary to preserve a party's rights under this Agreement that accrued prior to termination.

## 7. Representations, Warranties, Disclaimers and Limitations.

(a) **Business Operations.** Each party will make reasonable commercial efforts to keep its Web site operational during normal business hours. However, the parties agree that it is normal to have a certain amount of system downtime and agree not to hold each other or Your Advertisers liable for any of the consequences of such interruptions. CJ may modify the Network Service, or discontinue providing the Network Service, or any portion thereof, at any time.

(b) **Authority.** Each party represents and warrants to the other party as to itself that the person executing this Agreement is authorized to do so on such party's behalf. IF YOU ARE AN INDIVIDUAL, YOU REPRESENT AND WARRANT THAT YOU WERE AT LEAST 18 YEARS OF AGE ON THE EFFECTIVE DATE OF THIS AGREEMENT.

(c) **Non-Infringement Warranties.** You represent and warrant that: (i) You have all appropriate authority to operate, and to any and all content on, Your Web site(s); (ii) You have all appropriate authority in any promotional method you may choose to use; (iii) Your Web site(s) and Your promotional methods do not and will not infringe a third party's, a CJ Advertiser's, or CJ's, proprietary rights; and (iv) You shall remain solely responsible for any and all Web sites owned and/or operated by You and all of Your promotional methods. CJ may or may not review all content on Your Web site or used by You in Your promotional methods.

(d) **Compliance with Laws.** You are responsible for compliance with the requirements of all relevant legislation (including subordinate legislation and the rules of statutorily recognized regulatory authorities) in force or applicable in the United States or in any other applicable territory, and warrant that no promotion method used by You or the content of Your Web site(s) will render CJ liable to any proceedings whatsoever.

(e) **Limitation of Liabilities.** ANY OBLIGATION OR LIABILITY OF CJ UNDER THIS AGREEMENT SHALL BE LIMITED TO THE TOTAL OF YOUR PAYOUTS PAID TO YOU BY CJ UNDER THIS AGREEMENT DURING THE YEAR PRECEDING THE CLAIM. NO ACTION, SUIT OR PROCEEDING SHALL BE BROUGHT AGAINST THE OTHER PARTY TO THIS AGREEMENT MORE THAN ONE YEAR AFTER THE TERMINATION OF THIS AGREEMENT. YOU AGREE THAT CJ SHALL NOT BE LIABLE TO YOU, OR ANY THIRD PARTY (INCLUDING BUT NOT LIMITED TO A CLAIM BY ANOTHER PUBLISHER OR AN ADVERTISER OF THE NETWORK SERVICE), FOR ANY CONSEQUENTIAL, EXEMPLARY, SPECIAL, INCIDENTAL, OR PUNITIVE DAMAGES, INCLUDING, BUT NOT LIMITED TO, LOSS OF GOODWILL, LOST PROFITS, BUSINESS INTERRUPTION, LOSS OF PROGRAMS OR OTHER DATA, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES OR CLAIM.

(f) **Disclaimer of Warranties.** TO THE FULLEST EXTENT PERMISSIBLE PURSUANT TO APPLICABLE LAW, CJ DISCLAIMS ALL WARRANTIES IMPLIED, INCLUDING, BUT NOT LIMITED TO, (A) MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR NON-INFRINGEMENT OF THIRD PARTY RIGHTS, (B) THAT THERE ARE

NO VIRUSES OR OTHER HARMFUL COMPONENTS, (C) THAT CJ'S SECURITY METHODS WILL BE SUFFICIENT, (D) REGARDING CORRECTNESS, ACCURACY, OR RELIABILITY, OR (D) AGAINST INTERFERENCE WITH ENJOYMENT OF THE PUBLISHER'S INFORMATION OR WEB SITE. ALL 'INFORMATION' AND 'COMPUTER PROGRAMS' PROVIDED TO YOU IN THE COURSE OF THIS AGREEMENT ARE PROVIDED WITH ALL FAULTS, AND THE ENTIRE RISK AS TO SATISFACTORY QUALITY, PERFORMANCE, ACCURACY, AND EFFORT IS WITH YOU. CJ IS, UNDER NO CIRCUMSTANCES, RESPONSIBLE FOR THE PRACTICES, ACTS OR OMISSIONS OF ANY ADVERTISER OR PUBLISHER, OR SUCH ADVERTISER OR PUBLISHER'S WEB SITE(S), AND/OR THE CONTENT OF AN ADVERTISER'S WEB SITE OR THAT AN ADVERTISER MAKES AVAILABLE THROUGH THE NETWORK SERVICE.

(g) Remedies. No remedy or election shall be deemed exclusive but shall, wherever possible, be cumulative with all other remedies at law or in equity.

(h) Benefit of the Bargain. THE PROVISIONS OF THIS SECTION 7 ARE AN ESSENTIAL ELEMENT OF THE BENEFIT OF THE BARGAIN REFLECTED IN THIS AGREEMENT.

8. Publisher's Indemnification Obligations. Publisher shall defend, indemnify and hold CJ and Advertisers harmless against all claims, suits, demands, damages, liabilities, losses, penalties, interest, settlements and judgments, costs and expenses (including attorneys' fees) incurred, claimed or sustained by third parties, including but not limited to Advertisers, directly or indirectly as a result of (a) Publisher's breach of or non-compliance with this Agreement, (b) Publisher's violation of any law, or an alleged violation of law by CJ, that is a direct or indirect result of Publisher's use of the Network Service, (c) Publisher's use of the Network Service, (d) Publisher's participation in any Program, (c) any content, goods or services offered, sold or otherwise made available by Publisher to any person, (f) Publisher's acts or omissions in using, displaying or distributing any internet links obtained from the Network Service or elsewhere, including but not limited to Publisher's use of internet links via email distribution, (g) any claim that CJ is obligated to pay tax obligations in connection with payment made to Publisher pursuant to this Agreement and/or any Advertiser's Program, and (h) any violation or alleged violation by Publisher of any rights of another, including breach of a person's or entity's intellectual property rights (each (a)-(h) individually is referred to hereinafter as a "Claim"). Should any Claim give rise to a duty of indemnification under this Section 8, CJ shall promptly notify Publisher, and CJ shall be entitled, at its own expense, and upon reasonable notice to Publisher, to participate in the defense of such Claim. Participation in the defense shall not waive or reduce any of Publisher's obligations to indemnify or hold CJ harmless. Publisher shall not settle any Claim without CJs prior written consent. Publisher also shall indemnify for any reasonable attorneys' fees or other costs incurred by an indemnified party in investigating or enforcing this Section 8. In the context of this Section 8 only, the term "CJ" shall include officers, directors, employees, corporate affiliates, subsidiaries, agents, and subcontractors.

9. Miscellaneous.

(a) Headings and References. Headings of Sections are for the convenience of reference only. Words indicated in quotes and capitalized signify an abbreviation or defined term for indicated words or terms, including those definitions contained in the opening paragraph

(b) Third Party Disputes. In the event of a third party claim against either: (a) CJ's intellectual property; or (b) against CJ's right to offer any service or good on CJ's Web site(s) or if, in CJ's opinion, such a claim is likely, CJ shall have the right, at its sole option and in its sole discretion, to (i) secure the right at CJ's expense to continue using the intellectual property or good or service; or (ii) at CJ's expense replace or modify the same to make it non-infringing or without misappropriation.

(c) Relationships of Parties/Third Party Rights. The relationships of the parties to this Agreement shall be solely that of independent contractors, and nothing contained in this Agreement shall be construed otherwise. Nothing in this Agreement or in the business or dealings between the parties shall be construed to make them joint venturers or partners with each other. Neither party shall do anything to suggest to third parties that the relationship between the parties is anything other than that of independent contractor. You agree that Your consent is not necessary to modify any Advertiser Service Agreement.

(d) Choice of Law/Attorneys' Fees. This Agreement is governed by the laws of the State of California (USA), except for its conflict of law provisions. The exclusive forum for any actions related to this Agreement shall be in the state courts, and, to the extent that federal courts have exclusive jurisdiction, in Los Angeles, California. The parties consent to such venue and jurisdiction and waive any right to a trial by jury. The application of the United Nations Convention on the International Sale of Goods is expressly excluded. A party that primarily prevails in an action brought under this Agreement is entitled to recover from the other party its reasonable attorneys fees and costs. CJ controls and operates its Web site from its offices in the USA and access or use where illegal is prohibited.

(e) Force Majeure. Neither party shall be liable by reason of any failure or delay in the performance of its obligations hereunder for any cause beyond the reasonable control of such party, including but not limited to electrical outages, failure of Internet service providers, default due to Internet disruption (including without limitation denial of service attacks), riots, insurrection, acts of terrorism, war (or similar), fires, flood, earthquakes, explosions, and other acts of God.

(f) Severability/Waiver. If any provision of this Agreement is held by any court of competent jurisdiction to be illegal, null or void or against public policy, the remaining provisions of this Agreement shall remain in full force and effect. The parties shall in good faith attempt to modify any invalidated provision to carry out the stated intentions in this

Agreement. The waiver of any breach of any provision under this Agreement by any party shall not be deemed to be a waiver of any preceding or subsequent breach, nor shall any waiver constitute a continuing waiver.

(g) **Assignment and Acknowledgement.** Neither party may assign this Agreement without the prior express written permission of the other party. Notwithstanding the foregoing, Your consent shall not be required for assignment or transfer made by CJ (1) due to operation of law, or (2) to an entity that acquires substantially all of CJ's stock, assets or business, or (3) to a related entity (e.g. parent or subsidiary of parent). Your use of the Network Service is irrefutable acknowledgement by You that You have read, understood and agreed to each and every term and provision of this Agreement. CJ may establish from time to time rules and regulations regarding use of the Network Service as published on the Network Service and incorporated herein.

(h) **Marketing.** Publisher agrees that CJ may identify it as a CJ Publisher in client lists and may use Publisher's name and/or logo solely for such purpose in its marketing materials. Any other uses of Publisher's name and/or logo not otherwise described or contemplated herein shall require Publisher's prior written consent.

(i) **Entire Agreement, Assignment and Amendment.** This Agreement, including the Introduction, contains the entire understanding and agreement of the parties and there have been no promises, representations, agreements, warranties or undertakings by either of the parties, either oral or written, except as stated in this Agreement. This Agreement may only be altered, amended or modified by an instrument that is assented to by each party to this Agreement by verifiable means, including without limitation by written instrument signed by the parties or through a "click through" acknowledgement of assent. No interlineations to this Agreement shall be binding unless initialed by both parties. Notwithstanding the foregoing, CJ shall have the right to change, modify or amend ("Change") this Agreement, in whole or in part, by posting a revised Agreement at least 14 days prior to the effective date of such Change. Your continued use of the Network Service after the effective date of such Change shall be deemed Your acceptance of the revised Agreement.

| | |
|---|---|
| COMMISSION JUNCTION, INC.<br>530 East Montecito Street<br>Santa Barbara, CA 93103 USA<br>a Delaware Corporation, EIN#41-41-1922033 | "You":_____<br><br>Address:_____<br><br>_____ |
| By:_____ | By:_____ |
| Name:_____ | Name:_____ |
| Title:_____ | Title:_____ |
| Date:_____ | Date:_____ |
| | Federal ID # (or Company Reg. No.):_____ |

EXHIBIT "3"

# <u>Special Terms & Conditions</u> » eBay Affiliate Global Ts&Cs Oct. 1, 2005

## eBay Terms and Conditions
## <u>eBay Affiliate Program - Supplemental Terms and Conditions</u>

In consideration for Your participation in the Affiliate Program (the "Program") maintained by eBay Inc. ("eBay") through Commission Junction, Inc. ("CJ"), You agree to comply with these Supplemental Terms and Conditions ("Terms and Conditions") in addition to the terms of the Commission Junction Publisher Service Agreement ("PSA"). If any of these Terms and Conditions conflict with those of the PSA, then these Terms and Conditions will control. Capitalized terms not defined herein have the meanings set forth in the PSA.

(1) **eBay Trademarks.** You will not use in your domain name or URL (specifically, any term before the third "/" of your URL) nor purchase or register in any search, referral, or advertising service (such as Google's AdWords program) any of the following terms:

    a.  . Any domestic or international eBay company trademarks, and all translations thereof, including "eBay", "PayPal", "Half" or any URL or keyword string that includes eBay company names (for example, "www.yourcompany-ebay.com", "eBay auctions", "eBaymotors", "ebay motors", "eBay jewelry", "PayPalpayments", "paypal payments", "Halfitems", "Half items"); or

    b.  Variations of any eBay company trademarks (for example, "e-bay", "ebay.com", "www.ebay.com", "e.bay", "e bay", "www.ebay", "ww.ebay.com", "e-bay.com", "www,ebay.com", "e.bay", "wwwebay.com", "ebya", "eaby", "Pay-Pal", "Pay Pal", "Half.com", "Half com", "Half.ebay.com", "Half ebay com", "ebay half").

    \* Please note: this is not an exhaustive list of prohibited words, phrases, or combinations thereof.

(2) **Unacceptable terms.** You shall not purchase or register search engine keywords, AdWords, search terms or other identifying terms that eBay considers in its sole discretion to fall into any of the following categories:

    - Promote sexually explicit materials
    - Promote violence
    - Promote firearms or weapons
    - Promote illegal activities
    - Promote fake or counterfeit items
    - Promote gambling or betting
    - Promote discrimination based on race, sex, religion, nationality, disability, sexual orientation, or age
    - Infringe upon others' intellectual property rights


CONFIDENTIAL
ATTORNEY'S EYES ONLY

0000642

(3) **Tracking Tags.** As part of the Program, CJ or eBay may provide you with tools, products, and creative assets (collectively, "Assets") that include information that helps track Transactions generated by You and attribute them to Your Account. You will use each of these Assets only in their intended manner as instructed by CJ, and will not corrupt, modify, or disable them. You will not deliver any eBay-related cookies or other tracking tags to the computers of users that are merely viewing Your advertisements or while Your applications are merely active or open.

(4) **Compensation.** For each transaction, You will be compensated in accordance with the then-current Payout schedule for Transactions on the eBay.com site ("Commission-Earning Activity"). To qualify as a payable transaction, a user must take an affirmative action, clicking on your properly-coded link in a browser or browser environment.

> a. Items listed on Froogle (or any of its successor sites) are excluded from Commission-Earning Activity.
>
> b. eBay reserves the right to delay Your compensation if there is a suspicion of bad faith associated with any transaction driven by You.
>
> c. eBay reserves the right to delay Your compensation if You are suspected of causing users non-compliance with eBay's User Agreement (e.g. causing unpaid items)

(5) **No Affiliate Links.** You may not include affiliate links on any ebay.com page or eBay-owned page, such as an eBay listing or eBay Store. Nor may You use affiliate links to promote your own eBay listings or eBay Store, those of your Sub-Publisher or those of anyone else with whom you are affiliated.

(6) **No Sniping.** You many not automatically place bids for users.

(7) **Terms Governing Downloadable Software.** You will be paid for Commission-Earning Activity derived from downloadable software (DLS) only if the DLS complies with all of these Terms and Conditions and the PSA.

> a. **Legal Compliance.** The operation of the DLS complies with all applicable laws in all relevant jurisdictions and does not deceive consumers about its nature, purpose, or operation.
>
> b. **Informed Consent.** The DLS is not installed or executed on the computer of any user until that user has given explicit consent to its installation or execution. "Explicit consent" means:
>
> > i. The user has received a clear, brief, and conspicuous notice, in plain language and outside of any user agreement or terms , that the DLS will collect information about web usage (and, if applicable, personally identifiable information), and will use that information to display advertising on the user's computer (including, if possible, a description of the frequency of such advertising);
> >
> > ii. The user has been provided with, or has been provided an opportunity to access, a more detailed description of the type(s) of information collected

CONFIDENTIAL
ATTORNEYS EYES ONLY

and the purpose(s) for which it will be used;

   iii.   If the DLS is bundled with other software, the user has been provided with specific identification of the advertising-serving program(s) ("Adware") in the bundle; and

   iv.   After receiving the notice specified in (i) and after being provided, or provided an opportunity to access, the information specified in (ii) and (iii), the user affirmatively chooses to have the DLS installed or executed on his or her computer.

c.  **Easy Removal.** A user must be able to completely uninstall the DLS through a means that the user can readily identify and perform without undue effort or specialized knowledge (preferred alternatives include providing easy access to an uninstall process from the content or framing of the DLS or a readily recognizable icon or listing the DLS in the add/remove feature in the Windows operating system). Uninstall processes must not be deceptive, complicated or confusing (such as listing DLS under multiple, confusing or deceptive names, requiring users to re-boot unnecessarily, using confusing language in pop-up challenges, or requiring more clicks than necessary to complete the un-install process). Each DLS-affiliated feature must contain the name of the DLS in the uninstall user interface.

d.  **Full Disclosure.** All ads generated on the user's screen by the DLS identify the DLS as the source of the ad, using the same name as provided most prominently at the time the DLS was downloaded.

e.  **No Persistent Ads.** Users must be able to close (without ending their browser sessions) any DLS-generated pop-ups, pop-unders, or other advertisements that cover otherwise viewable content.

f.  **Value to User.** Either the DLS or an application bundled with the DLS must have meaningful value to the user that outweighs any burden imposed. For example, DLS that is combined with a comparison-shopping engine would meet this requirement.

g.  **No Sniping.** The DLS cannot automatically place bids for users.

h.  **Limited Number of Ads.** The DLS will not serve an unreasonable number of pop-up or pop-under advertisements per day or per web browsing session.

i.  **Not Aimed at Children.** The DLS is not specifically or primarily marketed to children under the age of 18 or downloadable from websites or services primarily oriented toward children.

j.  **Prohibited Operations.** Neither the DLS, nor any other software bundled with or distributed with the DLS, performs any of the following functions unless explicitly instructed to do so by the user

   i.   sending unsolicited information or material to another computer;

   ii.   diverting the user to another site not requested by the user;

   iii.   initiating or terminating a user's connection to the Internet;

   iv.   modifying the user's settings with respect to browser home page, Internet connections (including default access provider), bookmarks, or security levels;

   v.   keystroke logging;

   vi.   automatic re-installing or re-activating itself or another application after


CONFIDENTIAL
ATTORNEY'S EYES ...

being uninstalled or removed by the user; or

    vii.  removing or disabling security, pop-up-blocking, anti-virus, anti-Adware, or anti-spyware programs on the user's computer. For these purposes, spyware is defined as software that surreptitiously gathers a user's personally identifiable information.

k. **Other Terms.** You will provide CJ with an accurate and thorough description of the DLS on which any of Your ads appear. You will also notify CJ in writing or by email such that CJ receives your notice at least 10 days before there is any material change to the operation of the DLS. Except for any perpetual eBay search box or any toolbar that has a perpetual link to eBay, the DLS will not display an ad (including any pop-ups, pop-unders or tool bars) that contains eBay affiliate links while an eBay page is open on a user's computer.

**(8) Terms Governing Incentive Sites.** You will not directly or indirectly offer any consideration or incentive for any Commission-Earning Activity or for clicking on an affiliate program-coded link unless expressly authorized to do so in writing by CJ. Each such written authorization will authorize only one specific incentive. Any subsequent change to an authorized incentive must be re-submitted in writing for authorization by CJ.

**(9) Your Responsibility for Your Agents.** You will not make any commitments or representations on behalf of eBay with regard to any relationship you enter into with Your Sub-Publishers, Distribution Partners, or any other third parties (collectively, "Agents") in connection with your promotion of an eBay site. You will ensure that Your Agents agree to terms and conditions that are at least as restrictive as the PSA and these Terms and Conditions, subject to applicable law, and shall include a provision in such terms and conditions that eBay is a third party beneficiary. Any violation by Your Agents of the terms and conditions of this Agreement shall constitute a violation by You, and CJ and eBay shall have full recourse against You with respect to such a violation, including without limitation, suspension or termination from the Program.

a. **Agents.** You must identify each Sub-Publisher with a unique tracking ID (PID). eBay reserves the right to terminate any affiliate engaging in "Sub-Publisher" or "distribution partner" agent relationships at any time, at eBay's discretion, based on a breach of these terms and condition by Your Agent

**(10) Disclaimer of Warranties.** EBAY AND CJ DISCLAIM ALL WARRANTIES AND CONDITIONS, EXPRESS, IMPLIED OR STATUTORY, INCLUDING WITHOUT LIMITATION THE IMPLIED WARRANTIES OF NON-INFRINGEMENT, MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. EBAY AND CJ, EACH INDIVIDUALLY, EXPRESSLY DISCLAIMS ALL LIABILITY RELATING TO THESE TERMS AND CONDITIONS OR THE PROGRAM.

**(11) Email Promotion.** You agree not to send any emails in Your promotion of the eBay site unless authorized and approved to do so by CJ. Authorization and approval of email

CONFIDENTIAL
ATTORNEY'S EYES ONLY

marketing includes additional terms and conditions to which you must agree before such promotion begins.

**(12) Global Compliance.** Any infractions of these terms and conditions will be monitored and enforced globally. Violations in one country program will be counted equal with violations in all other country programs with which You or your Agents are affiliated.

**(13) Publisher's Indemnification Obligations.** You will defend, indemnify, and hold each of eBay and CJ harmless against all claims, liabilities, and expenses claimed or incurred by third parties directly or indirectly as a result of any breach of these terms and conditions, and/or distribution or use of applications or content by You, Your Agents, or anyone else that you are affiliated with.

**(14) Remedy for Breach.** If You breach any of these terms, in addition to any other available remedies, eBay may remove You from the Program immediately, withhold or recover any compensation for transactions not in compliance with these terms, and seek removal of any search terms registered or purchased in violation of the terms.

**(15) Amendment.** eBay may amend these Terms and Conditions by notifying You through CJ, email, or mail sent to Your address of record. You may review any revised Terms and Conditions for up to seven days after eBay sends its notice. After seven days, the revised terms will automatically take effect and become fully enforceable. If You do not agree with the revised Terms and Conditions, You will remove Yourself from the Program through Your Account and remove and stop promoting any eBay Links.

**(16) Acceptance.** By clicking on the "ACCEPT" link below, You are agreeing to be bound the terms in these Terms and Conditions. If You do not understand or agree to all of the terms and conditions of these Terms and Conditions, click the "CLOSE" button.

**CONFIDENTIAL**
**ATTORNEY'S EYES ONLY**

EXHIBIT "4"

1  DAVID R. EBERHART (S.B. #195474)
   deberhart@omm.com
2  SHARON M. BUNZEL (S.B. #181609)
   sbunzel@omm.com
3  COLLEEN M. KENNEDY (S.B. #227107)
   ckennedy@omm.com
4  O'MELVENY & MYERS LLP
   Two Embarcadero Center, 28th Floor
5  San Francisco, CA 94111-3305
   Telephone:   (415) 984-8700
6  Facsimile:   (415) 984-8701

7  Attorneys for Plaintiff eBay Inc.

8
                 UNITED STATES DISTRICT COURT
9
                NORTHERN DISTRICT OF CALIFORNIA
10
                      SAN JOSE DIVISION
11
   EBAY INC.,                         Case No.  C 08-4052 JF
12
                  Plaintiff,          **PLAINTIFF'S FIRST SET OF**
13                                    **REQUESTS FOR ADMISSION TO**
                                      **DEFENDANT KESSLER'S FLYING**
14        v.                          **CIRCUS (Nos. 1-25)**

15 DIGITAL POINT SOLUTIONS, INC.,
   SHAWN HOGAN, KESSLER'S
16 FLYING CIRCUS, THUNDERWOOD
   HOLDINGS, INC., TODD DUNNING,
17 DUNNING ENTERPISE, INC., BRIAN
   DUNNING, BRIANDUNNING.COM,
18 and DOES 1 - 20,

19                Defendants.

20

21

22        Pursuant to Rule 36 of the Federal Rules of Civil Procedure, Plaintiff eBay Inc.
23 ("eBay"), hereby requests that Defendant Kessler's Flying Circus ("KFC") respond to
24 each of the following requests for admission fully, separately, in writing and under oath,
25 within thirty (30) days of service hereof.
26

27

28
                                      FIRST SET OF REQUESTS
                                       FOR ADMISSION - KFC
                                      CASE NO. C 08-4052 JF

## DEFINITIONS

1.   "KFC" shall mean Kessler's Flying Circus, and each of its successor, predecessor, and related entities, including, without limitation, its subsidiaries, parent corporations, divisions, assigns, and any officers, directors, agents, employees, representatives, attorneys, or other persons or entities acting on its behalf, collectively, in any combination, or singly, whichever is broader.

2.   "eBay" shall mean plaintiff eBay Inc., www.ebay.com, all of eBay's internationally operated websites, and any and all divisions, subdivisions, departments or subsidiaries of eBay.

3.   "Affiliate Marketing Program" shall mean any program by which a company engages or employs third parties (affiliates) to conduct marketing efforts on its behalf.

4.   "Cookie Stuffing" is broadly defined to include any scheme that includes the placement by a web server onto a User's computer of data known as a "cookie" where (a) the placement occurs because the User's computer accessed that web server and (b) the User did not knowingly access that web server.

5.   "User" or "Users" shall mean a third party or parties connected to the internet through a personal computer or by any other means.

6.   "Advertisement Link" shall mean any advertisement presented via the internet that, if a User clicks on that advertisement, directs a User's computer to the website that is owned by or is the subject of the advertisement.

## REQUESTS FOR ADMISSION

### REQUEST FOR ADMISSION NO. 1:

Admit that KFC conducted business with eBay during at least some portion of 2007.

### REQUEST FOR ADMISSION NO. 2:

Admit that KFC conducted business with eBay during at least some portion of

- 2 -

2006.

**REQUEST FOR ADMISSION NO. 3:**

Admit that KFC conducted business with eBay during at least some portion of 2005.

**REQUEST FOR ADMISSION NO. 4:**

Admit that KFC conducted business with eBay during at least some portion of 2004.

**REQUEST FOR ADMISSION NO. 5:**

Admit that KFC conducted business with eBay during at least some portion of 2003.

**REQUEST FOR ADMISSION NO. 6:**

Admit that KFC participated in an eBay Affiliate Marketing Program or programs.

**REQUEST FOR ADMISSION NO. 7:**

Admit that, while participating in an eBay Affiliate Marketing Program or programs, KFC utilized software programs and/or code that caused some Users' computers to access an eBay website without the User's knowledge.

**REQUEST FOR ADMISSION NO. 8:**

Admit that, while participating in an eBay Affiliate Marketing Program or programs, KFC utilized software programs and/or code that caused some Users' computers to access an eBay web server without the User's knowledge.

**REQUEST FOR ADMISSION NO. 9:**

Admit that, while participating in an eBay Affiliate Marketing Program or

programs, KFC utilized software programs and/or code that redirected a User to an eBay

website without the User knowingly clicking on an Advertisement Link.

**REQUEST FOR ADMISSION NO. 10:**

Admit that, while participating in an eBay Affiliate Marketing Program or

programs, KFC utilized software programs and/or code that redirected a User to an eBay

web server without the User knowingly clicking on an Advertisement Link.

**REQUEST FOR ADMISSION NO. 11:**

Admit that, while participating in an eBay Affiliate Marketing Program or

programs, KFC utilized software programs and/or code that performed Cookie Stuffing.

**REQUEST FOR ADMISSION NO. 12:**

Admit that KFC used methods, techniques and/or technological measures to avoid

detection by eBay of certain aspects of how KFC interacted with eBay's Affiliate

Marketing Program or programs.

**REQUEST FOR ADMISSION NO. 13:**

Admit that KFC used methods, techniques and/or technological measures to avoid

detection by Commission Junction of certain aspects of how KFC interacted with eBay's

Affiliate Marketing Program or programs.

**REQUEST FOR ADMISSION NO. 14:**

Admit that KFC utilized methods, techniques and/or technological measures to

avoid detection by eBay of Cookie Stuffing caused by KFC.

**REQUEST FOR ADMISSION NO. 15:**

Admit that KFC utilized methods, techniques and/or technological measures to

avoid detection by Commission Junction of Cookie Stuffing caused by KFC.

**REQUEST FOR ADMISSION NO. 16:**

Admit that, while participating in an eBay Affiliate Marketing Program or programs, KFC utilized software and/or code to determine the geographic location of a User.

**REQUEST FOR ADMISSION NO. 17:**

Admit that, while participating in an eBay Affiliate Marketing Program or programs, KFC utilized software and/or code to determine whether a User was located in San Jose, CA.

**REQUEST FOR ADMISSION NO. 18:**

Admit that, while participating in an eBay Affiliate Marketing Program or programs, KFC utilized software and/or code to determine whether a User was located in Santa Barbara, CA.

**REQUEST FOR ADMISSION NO. 19:**

Admit that, while participating in an eBay Affiliate Marketing Program or programs, KFC utilized software and/or code that would disable or not engage KFC's Cookie Stuffing technology if a User's computer was located in San Jose, CA.

**REQUEST FOR ADMISSION NO. 20:**

Admit that, while participating in an eBay Affiliate Marketing Program or programs, KFC utilized software and/or code that would disable or not engage KFC's Cookie Stuffing technology if a User's computer was located in Santa Barbara, CA.

**REQUEST FOR ADMISSION NO. 21:**

Admit that KFC received commissions from eBay, whether directly or through Commission Junction, that were based, in whole or in part, on Users whose computers were directed to eBay's website without the User's knowledge.

**REQUEST FOR ADMISSION NO. 22:**

Admit that KFC received commissions from eBay, whether directly or through Commission Junction, that were based, in whole or in part, on Users who had never actually clicked on a KFC-sponsored eBay advertisement link.

**REQUEST FOR ADMISSION NO. 23:**

Admit that KFC received commissions from eBay, whether directly or through Commission Junction, that were based, in whole or in part, Cookie Stuffing caused by KFC.

**REQUEST FOR ADMISSION NO. 24:**

Admit that KFC engaged in Cookie Stuffing with the intent to defraud eBay.

**REQUEST FOR ADMISSION NO. 25:**

Admit that KFC defrauded eBay.


Dated: January 22, 2009          O'MELVENY & MYERS LLP


By: _____
    David R. Eberhart, Esq.
    Sharon M. Bunzel, Esq.
    Colleen M. Kennedy, Esq.
    Attorneys for Plaintiff eBAY INC.

- 6 -

EXHIBIT "5"

1  DAVID R. EBERHART (S.B. #195474)
   deberhart@omm.com
2  SHARON M. BUNZEL (S.B. #181609)
   sbunzel@omm.com
3  COLLEEN M. KENNEDY (S.B. #227107)
   ckennedy@omm.com
4  O'MELVENY & MYERS LLP
   Two Embarcadero Center, 28th Floor
5  San Francisco, CA 94111-3305
   Telephone:   (415) 984-8700
6  Facsimile:   (415) 984-8701

7  Attorneys for Plaintiff eBay Inc.

8              UNITED STATES DISTRICT COURT

9             NORTHERN DISTRICT OF CALIFORNIA

10                 SAN JOSE DIVISION

11 EBAY INC.,                          Case No.  C 08-4052 JF

12              Plaintiff,             **PLAINTIFF'S FIRST SET OF**
                                       **INTERROGATORIES TO**
13      v.                             **DEFENDANT KESSLER'S FLYING**
                                       **CIRCUS (Nos. 1-2)**
14 DIGITAL POINT SOLUTIONS, INC.,
15 SHAWN HOGAN, KESSLER'S
   FLYING CIRCUS, THUNDERWOOD
16 HOLDINGS, INC., TODD DUNNING,
   DUNNING ENTERPRISE, INC., BRIAN
17 DUNNING, BRIANDUNNING.COM,
   and DOES 1 - 20,
18
                Defendants.
19

20

21

22        Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Plaintiff eBay Inc.
23
   ("eBay"), hereby requests that Defendant Kessler's Flying Circus ("KFC") respond to
24
   each of the following interrogatories fully, separately, in writing and under oath, within
25
   thirty (30) days of service hereof.
26
                         **DEFINITIONS**
27
        1.    "KFC" shall mean Kessler's Flying Circus, Inc., and each of its successor,
28

predecessor, and related entities, including, without limitation, its subsidiaries, parent corporations, divisions, assigns, and any officers, directors, agents, employees, representatives, attorneys, or other persons or entities acting on its behalf, collectively, in any combination, or singly, whichever is broader.

2. "eBay" shall mean plaintiff eBay Inc., www.ebay.com, all of eBay's internationally operated websites, and any and all divisions, subdivisions, departments or subsidiaries of eBay.

3. "Affiliate Marketing Program" shall mean any program by which a company engages third parties (affiliates) to engage in marketing efforts on its behalf.

4. "Internet Forum" shall mean any method or facility for publication of content or communication among Users that is accessed or used via the Internet or other computer network including, but not limited to, message and bulletin boards, blogs, Usenet newsgroups, chatrooms, IRC channels or listservs.

5. "Identify" (a) when used with respect to a person, means his or her name, present or last known (specify which) home address, present or last known (specify which) telephone number and present or last known (specify which) employer and the address thereof; (b) when used with respect to an entity or any other non-natural person, means the full name, present or last known address (specify which), present or last known telephone number (specify which), and the state and country of organization.

## INSTRUCTIONS

1. If you cannot answer a particular interrogatory in full after exercising due diligence to secure the information to do so, answer to the extent possible, by specifying your inability to answer the remainder, and stating whatever information or knowledge you have concerning the unanswered portion.

2. If you object to any part of an interrogatory, answer all parts of such interrogatory to which you do not object and, as to each part to which you do object, set forth the specific basis for your objection.

3. Except as specifically provided herein, words imparting the singular shall

include the plural and vice versa, where appropriate.

    4.    "Related to," "relating to," "regarding," or "reflecting" shall mean identifying, mentioning, describing, discussing, memorializing, consisting of, evidencing, depicting, evaluating, commenting upon, or in any way concerning or regarding.

    5.    The words "and" and "or" shall be construed in the conjunctive or disjunctive, whichever makes the request more inclusive.

    6.    The term "including" means "including, but not limited to."

## INTERROGATORIES

## INTERROGATORY NO. 1:

Identify all persons or entities with knowledge regarding KFC's participation, manipulation or interaction in any Affiliate Marketing Program including eBay's Affiliate Marketing Programs including, but not limited to, all methods, techniques and technologies, software, source code, Javascript and HTML code, used by KFC to obtain revenue from, or otherwise interact with, participate in or manipulate any Affiliate Marketing Program.

## INTERROGATORY NO. 2:

Identify all Internet Forums at, within or through which KFC discussed any aspect of their participation in, manipulation of or interaction with eBay's Affiliate Marketing Programs, or any other Affiliate Marketing Program.

Dated: January 22, 2009      O'MELVENY & MYERS LLP

By: _____
    David R. Eberhart, Esq.
    Sharon M. Bunzel, Esq.
    Colleen M. Kennedy, Esq.
    Attorneys for Plaintiff eBAY INC.

- 3 -

EXHIBIT "6"

DAVID R. EBERHART (S.B. #195474)
deberhart@omm.com
SHARON M. BUNZEL (S.B. #181609)
sbunzel@omm.com
COLLEEN M. KENNEDY (S.B. #227107)
ckennedy@omm.com
O'MELVENY & MYERS LLP
Two Embarcadero Center, 28th Floor
San Francisco, CA 94111-3305
Telephone: (415) 984-8700
Facsimile: (415) 984-8701

Attorneys for Plaintiff eBay Inc.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| EBAY INC., <br><br> Plaintiff, <br><br> v. <br><br> DIGITAL POINT SOLUTIONS, INC., SHAWN HOGAN, KESSLER'S FLYING CIRCUS, THUNDERWOOD HOLDINGS, INC., TODD DUNNING, DUNNING ENTERPRISE, INC., BRIAN DUNNING, BRIANDUNNING.COM, and DOES 1 - 20, <br><br> Defendants. | Case No. C 08-4052 JF <br><br> **PLAINTIFF'S FIRST SET OF REQUESTS FOR PRODUCTION TO DEFENDANT KESSLER'S FLYING CIRCUS (Nos. 1-33)** |

Plaintiff eBay Inc. ("eBay") in accordance with Fed. R. Civ. P. 34, propounds the following document requests on Defendant Kessler's Flying Circus. ("KFC").

eBay requests that KFC produce the documents and things requested herein within 30 days from the date of service hereof at the offices of O'Melveny & Myers, LLP, Two Embarcadero Center, 28th Floor, San Francisco, California 94111, or at such other location as counsel for the parties may agree.

These discovery requests are deemed continuing. If KFC discovers documents responsive to any of these requests after their initial production, KFC is required to produce said documents as soon as practicable after their discovery. eBay reserves the right to amend, supplement and revise these requests.

## DEFINITIONS AND INSTRUCTIONS

The following definitions and instructions are to be considered applicable with respect to each request for production of documents contained herein:

1.     "KFC" shall mean Kessler's Flying Circus, and each of its successor, predecessor, and related entities, including, without limitation, its subsidiaries, parent corporations, divisions, assigns, and any officers, directors, agents, employees, representatives, attorneys, or other persons or entities acting on its behalf, collectively, in any combination, or singly, whichever is broader.

2.     "eBay" shall mean plaintiff eBay Inc., www.ebay.com, all of eBay's internationally operated websites, and any and all divisions, subdivisions, departments or subsidiaries of eBay.

3.     "Commission Junction" shall mean any and all parent organizations, divisions, subdivisions, departments or subsidiaries of Commission Junction.

4.     "Affiliate Marketing Program" shall mean any program by which a company engages third parties (affiliates) to engage in marketing efforts on its behalf.

5.     "Document" is used in the broadest possible sense and shall mean, without limitation, every writing or record of every type and description that is in your possession, custody, or control, whether an original or copy, in whatever form, and includes, but is not limited to, correspondence, files, drafts, term sheets, transcripts, minutes, memoranda, telegrams, telexes, stenographic and handwritten notes, studies, analyses, publications, books, pamphlets, pictures, photographs, films, video tapes, audio tapes, purchase orders, invoices, computer disks and printouts, drawings, diagrams, blueprints, affidavits, expense records, financial reports, journals, logs, diaries, calendars, voice recordings, tapes, maps, reports, surveys, charts, numbers or statistical computations, and every draft or copy

- 2 -

thereof, whether signed or unsigned

6.     "Communication" shall mean conversations, correspondence, telephone calls, meetings, or any transmission of information from one person to one or more persons.

7.     "Related to," "relating to," "regarding," or "reflecting" shall mean identifying, mentioning, describing, discussing, memorializing, consisting of, evidencing, depicting, evaluating, commenting upon, or in any way concerning or regarding.

8.     Documents in the custody or possession of KFC's counsel are deemed to be in the custody, possession or control of KFC.

9.     All documents requested shall be produced in the same file or organizational environment in which they are maintained. For example, a document that is part of a file, docket or other grouping should be physically produced together with all other documents from said file, docket or other grouping responsive to said request, in the same order or manner of arrangement as the original.

10.    In the event that any document responsive to the following document requests has been destroyed, otherwise disposed of, or no longer in the party's control or custody, that document is to be identified by author, addressee, date, subject matter, number of pages, attachments or appendices, all persons to whom it was distributed, shown or explained, date and manner of destruction or other disposition, and persons destroying or disposing of the document.

11.    All documents or information not produced in response to these requests by reason of a claim of privilege or otherwise, shall be included in a log that identifies with respect to each document or information, the date, author, recipient, copyees, subject matter, and the specific grounds for withholding the document or information from production.

12.    If KFC contends that any discovery request is objectionable in whole or in part, KFC shall state with particularity each objection, the basis for it, and the categories of information and documents to which the objections applies, and KFC shall respond to

the document request insofar as it is not deemed objectionable.

13. If KFC finds the meaning of any term in any discovery request unclear, KFC shall assume a reasonable meaning, state what the assumed meaning is, and respond to the request according to the assumed meaning.

14. The words "and" and "or" shall be construed in the conjunctive or disjunctive, whichever makes the request more inclusive.

15. The term "including" means "including, but not limited to."

16. As used herein, "all," "any," "each," or "every" means "all, each and every."

17. "User" shall mean anyone who uses a computer or internet service.

18. "Aliases" shall mean any string of characters used to identify a User within an online system, including chat rooms, blogs, listservs, Usenet newsgroups, file sharing systems or bulletin board systems. Aliases shall further encompass any screen name, user name, user id, moniker or nickname used to identify as User within an online system.

19. "Internet Forum" shall mean any method or facility for publication of content or communication among Users that is accessed or used via the Internet or other computer network including, but not limited to, message and bulletin boards, blogs, Usenet newsgroups, chatrooms, IRC channels or listservs.

20. The use of the singular shall be deemed to include the plural and the use of the plural shall be deemed to include the singular.

## REQUESTS FOR PRODUCTION

### REQUEST FOR PRODUCTION NO. 1:

All documents relating to eBay, including all agreements, terms of service and terms and conditions.

### REQUEST FOR PRODUCTION NO. 2:

All documents relating to, or Communications with, eBay or any current or former

employee of eBay.

**REQUEST FOR PRODUCTION NO. 3:**

All documents relating to payment of commissions or other revenue obtained by KFC through participation in, interaction with or manipulation of eBay's Affiliate Marketing Program.

**REQUEST FOR PRODUCTION NO. 4:**

All documents relating to eBay's Affiliate Marketing Program, including, but not limited to, all methods and technologies used by KFC to obtain revenue from, manipulate or otherwise interact with, eBay's Affiliate Marketing Program, including, but not limited to, all software, source code, Javascript, and HTML code.

**REQUEST FOR PRODUCTION NO. 5:**

All documents relating to advertisements for eBay used, or purported to be used, on any website or ad network that directed or referred Users to eBay as part of eBay's Affiliate Marketing Program.

**REQUEST FOR PRODUCTION NO. 6:**

All documents reflecting the number of Users who allegedly clicked on an advertisement for eBay used, or purported to be used, by KFC to direct or refer Users to eBay as part of eBay's Affiliate Marketing Program.

**REQUEST FOR PRODUCTION NO. 7:**

All documents relating to methods or techniques intended to, or causing, a User's browser to load any eBay webpage, webpage content or data therefrom.

**REQUEST FOR PRODUCTION NO. 8:**

All documents sufficient to identify all advertising networks, advertising syndication services or websites used or purportedly used by KFC to advertise or promote eBay or to interact in any way with eBay or eBay's Affiliate Marketing Programs.

**REQUEST FOR PRODUCTION NO. 9:**

All documents sufficient to identify all Affiliate Marketing Programs, not including eBay's Affiliate Marketing Program, with whom KFC obtained revenue or otherwise interacted.

**REQUEST FOR PRODUCTION NO. 10:**

All documents relating to and/or describing methods and techniques used by any other Affiliate Marketing Program that KFC interacted with, participated in or manipulated.

**REQUEST FOR PRODUCTION NO. 11:**

All documents sufficient to identify the source of any technology, technique or method used by KFC to participate in, manipulate or interact with the eBay Affiliate Marketing Program, or any other Affiliate Marketing Program.

**REQUEST FOR PRODUCTION NO. 12:**

All documents sufficient to identify any individuals, groups, books, manuals or other materials consulted by KFC while developing any technology, technique or method used by KFC to participate in, manipulate or interact with the eBay Affiliate Marketing Program, or any other Affiliate Marketing Program.

**REQUEST FOR PRODUCTION NO. 13:**

All documents relating to Commission Junction, including all agreements, terms of service and terms and conditions.

**REQUEST FOR PRODUCTION NO. 14:**

All documents relating to, or Communications with, Commission Junction or any current or former employee of Commission Junction.

**REQUEST FOR PRODUCTION NO. 15:**

All documents relating to, or Communications with, Digital Point Solutions, Inc., Thunderwood Holdings, Inc., Dunning Enterprise, Inc., or briandunning.com.

**REQUEST FOR PRODUCTION NO. 16:**

All Communications with Todd Dunning, Brian Dunning or Shawn Hogan.

**REQUEST FOR PRODUCTION NO. 17:**

All documents relating to, or Communications with, Rachael Hughes, or any companies or entities owned, controlled, affiliated with or used by Rachael Hughes, relating to eBay's Affiliate Marketing Program including, but not limited to, any agreements with Rachael Hughes and company and any technology transferred to or from Rachael Hughes and company.

**REQUEST FOR PRODUCTION NO. 18:**

All documents sufficient to describe all phone numbers, email addresses, web pages, instant messenger or mail accounts and social network accounts maintained, formerly maintained or registered to KFC.

FIRST SET OF REQUESTS
FOR PRODUCTION - KFC
CASE NO. C 08-04052 JF

**REQUEST FOR PRODUCTION NO. 19:**

Documents sufficient to identify any Aliases used by KFC in any Internet Forum at or within which KFC discussed any aspect of their participation in, manipulation of or interaction with eBay's Affiliate Marketing Program, or any other Affiliate Marketing Programs, including, but not limited to, forums such as blogs, listservs, Usenet newsgroups or chat rooms.

**REQUEST FOR PRODUCTION NO. 20:**

Documents sufficient to identify any Internet Forum at or within which KFC discussed any aspect of their participation in, manipulation of or interaction with eBay's Affiliate Marketing Programs, or any other Affiliate Marketing Programs, including, but not limited to, forums such as blogs, listservs, Usenet newsgroups or chat rooms.

**REQUEST FOR PRODUCTION NO. 21:**

Documents sufficient to identify all internet service providers (ISPs) and IP addresses used by KFC.

**REQUEST FOR PRODUCTION NO. 22:**

Documents sufficient to identify all computers, servers, electronic data storage and hosting companies, entities, or facilities used by KFC.

**REQUEST FOR PRODUCTION NO. 23:**

Documents sufficient to identify any entity used or hired to maintain or restore electronic data or systems relating to KFC's participation in, manipulation of or interaction with eBay's Affiliate Marketing Program.

**REQUEST FOR PRODUCTION NO. 24:**

Documents sufficient to identify software used to clean, reformat or erase hard-drives used by KFC, or any equipment owned, used or maintained by KFC.

**REQUEST FOR PRODUCTION NO. 25:**

All documents sufficient to identify all business entities or fictitious business names currently or formerly maintained by KFC.

**REQUEST FOR PRODUCTION NO. 26:**

All documents filed by KFC with any Secretary of State.

**REQUEST FOR PRODUCTION NO. 27:**

Documents sufficient to show the structure and organization of KFC and all companies or other entities owned or controlled by KFC that were involved in or interacted with any Affiliate Marketing Program.

**REQUEST FOR PRODUCTION NO. 28:**

Documents sufficient to identify all employees, contractors or temporary employees of KFC, their dates of employment, duties, salary and any other compensation.

**REQUEST FOR PRODUCTION NO. 29:**

All documents constituting KFC's annual, quarterly and monthly audited, compiled, reviewed or unaudited financial statements, including all income statements and balance sheets of KFC.

**REQUEST FOR PRODUCTION NO. 30:**

All documents sufficient to identify all assets and financial accounts (including those outside of the United States) maintained or formerly maintained by KFC.

**REQUEST FOR PRODUCTION NO. 31:**

Documents constituting KFC's tax returns for the years 2003 to the present.

**REQUEST FOR PRODUCTION NO. 32:**

All documents relating to the transfer or assumption of any liability by KFC.

**REQUEST FOR PRODUCTION NO. 33:**

All documents relating to any insurance policies relevant to this action.

Dated: January 22, 2009    O'MELVENY & MYERS LLP

By: _____

   David R. Eberhart, Esq.
   Sharon M. Bunzel, Esq.
   Colleen M. Kennedy, Esq.
   Attorneys for Plaintiff eBAY INC.

SFI:752635.1

FIRST SET OF REQUESTS
FOR PRODUCTION - KFC
CASE NO. C 08-04052 JF

EXHIBIT "7"

Home > Help > Your User Agreement

## Help

### Browse help

▶ **Searching & researching**

▶ **Bidding & buying**

▶ **Selling & seller fees**

▶ **Payment & shipping**

▶ **Feedback**

▶ **Membership & account**

---

eBay glossary

eBay acronyms

A-Z index

---

## Your User Agreement

The following describes the terms on which eBay offers you access to our services.

### Introduction

Welcome to eBay. By using the services on the eBay websites (eBay.com and other related websites where this agreement appears), you are agreeing to the following terms, including those available by hyperlink, with eBay Inc. and the general principles for the websites of our subsidiaries and international affiliates. If you reside outside of the United States, you are contracting with one of our international eBay companies: In countries within the European Union, your contract is with eBay Europe S.à r.l.; in all other countries, your contract is with eBay International AG. If you have any questions, please refer to our Help section.

Before you may become a member of eBay, you must read and accept all of the terms and conditions in, and linked to, this User Agreement and the Privacy Policy. We strongly recommend that, as you read this User Agreement, you also access and read the linked information. By accepting this User Agreement, you also agree that your use of some eBay-branded websites or websites we operate may be governed by separate user agreements and privacy policies. The agreement that applies on any of our domains and subdomains is always the agreement that appears in the footer of each website.

This Agreement is effective on August 13, 2008, for current users, and upon acceptance for new users. The previous amendment to this Agreement was effective for all users on July 9, 2007.

### Using eBay

While using eBay, you will not:

- post content or items in an inappropriate category or areas on our sites and services;
- violate any laws, third party rights, or our policies such as the Prohibited and Restricted Items policies;
- use our sites or services if you are not able to form legally binding contracts, are under the age of 18, or are temporarily or indefinitely suspended from our sites;
- fail to deliver payment for items purchased by you, unless the seller has materially changed the item's description after you bid, a clear typographical error is made, or you cannot authenticate the seller's identity;
- fail to deliver items purchased from you, unless the buyer fails to meet the posted terms, or you cannot authenticate the buyer's identity;
- manipulate the price of any item or interfere with other user's listings;
- circumvent or manipulate our fee structure, the billing process, or fees owed to eBay;
- post false, inaccurate, misleading, defamatory, or libelous content (including personal information);
- take any action that may undermine the feedback or ratings systems (such as displaying, importing or exporting feedback information off of the sites or using it for purposes unrelated to eBay);
- transfer your eBay account (including feedback) and User ID to another party without our consent;
- distribute or post spam, chain letters, or pyramid schemes;
- distribute viruses or any other technologies that may harm eBay, or the interests or property of eBay users;
- copy, modify, or distribute content from the Sites and eBay's copyrights and trademarks; or
- harvest or otherwise collect information about users, including email addresses, without their consent.

### Abusing eBay

eBay and the Community work together to keep our sites and services working properly and the Community safe. Please report problems, offensive content, and policy violations to us.

eBay's Verified Rights Owner (VeRO) program works to ensure that listed items do not infringe upon the copyright, trademark or other rights of third parties. If you believe that your rights have been violated, please notify our

---

### Contact us

Have a question? We can help.

[ Contact us ]

---

### Ask eBay members

Get help from other eBay members. Visit the Answer Center to post a question.

---

### Related help topics

eBay Privacy Policy

VeRO team through our Verified Rights Owner (VeRO) Program and we will investigate.

Without limiting other remedies, we may limit, suspend or terminate our service and user accounts, prohibit access to our website, delay or remove hosted content, and take technical and legal steps to keep users off the sites if we think that they are creating problems, possible legal liabilities, or acting inconsistently with the letter or spirit of our policies. We also reserve the right to cancel unconfirmed accounts or accounts that have been inactive for a long time.

## Fees and Services

Joining eBay and bidding on listed items is free. We do charge fees for using other services, such as listing items. When you list an item or use a service that has a fee you have an opportunity to review and accept the fees that you will be charged based on our Fees schedule, which we may change from time to time. Changes to that Policy are effective after we provide you with at least fourteen days' notice by posting the changes on the eBay site. We may choose to temporarily change the fees for our services for promotional events (for example, free listing days) or new services, and such changes are effective when we post the temporary promotional event or new service on the sites.

Unless otherwise stated, all fees are quoted in U.S. Dollars. You are responsible for paying all fees and applicable taxes associated with our sites and services in a timely manner with a valid payment method. If your payment method fails or your account is past due, we may collect fees owed using other collection mechanisms. (This includes charging other payment methods on file with us, retaining collection agencies and legal counsel, and for accounts over 180 days past due, deducting the amount owed from your PayPal account balance.)

## Content

When you give us content, you grant us a non-exclusive, worldwide, perpetual, irrevocable, royalty-free, sublicensable (through multiple tiers) right to exercise the copyright, trademark, publicity, and database rights (but no other rights) you have in the content, in any media known now or in the future.

For the convenience of sellers, we may offer catalogs of stock images, descriptions and product specifications, which are provided by third-parties. While we try to offer reliable data, we cannot promise that the catalogs will always be accurate and up-to-date. If you choose to include catalog content in your listings, you will be responsible for ensuring that your listings are accurate and do not include misleading information. You agree that you will not hold our catalog providers responsible for inaccuracies in their catalogs. The catalogs may include copyrighted, trademarked or other proprietary materials. You may use the catalogs only for informational purposes and only in connection with your eBay listings. You may not use catalog content in a way that infringes or violates anyone's proprietary rights.

## Liability

You will not hold eBay responsible for other users' content, actions or inactions, or items they list. You acknowledge that we are not a traditional auctioneer. Instead, the sites are a venue to allow anyone to offer, sell, and buy just about anything, at anytime, from anywhere, in a variety of pricing formats and venues, such as stores, fixed price formats and auction-style formats. We are not involved in the actual transaction between buyers and sellers. We have no control over and do not guarantee the quality, safety or legality of items advertised, the truth or accuracy of users' content or listings, the ability of sellers to sell items, the ability of buyers to pay for items, or that a buyer or seller will actually complete a transaction.

We do not transfer legal ownership of items from the seller to the buyer, and nothing in this agreement shall modify the governing provisions of California Commercial Code § 2401(2) and Uniform Commercial Code § 2-401(2), under which legal ownership of an item is transferred upon physical delivery of the item to the buyer by the seller. Unless the buyer and the seller agree otherwise, the buyer will become the item's lawful owner upon physical receipt of the item from the seller, in accordance with California Commercial Code § 2401(2) and Uniform Commercial Code § 2-401(2). Further, we cannot guarantee continuous or secure access to our services, and operation of the sites may be interfered with by numerous factors outside of our control. Accordingly, to the extent legally permitted, we exclude all implied warranties, terms and conditions. We are not liable for any loss of money, goodwill, or reputation, or any special, indirect, or consequential damages arising out of your use of our sites and services. Some jurisdictions do not allow the disclaimer of warranties or exclusion of damages, so such disclaimers and exclusions may not apply to you.

Regardless of the previous paragraph, if we are found to be liable, our liability to you or to any third party is limited to the greater of (a) the total fees you paid to us in the 12 months prior to the action giving rise to the liability, and (b) $100.

## Release

If you have a dispute with one or more users, you release us (and our officers, directors, agents, subsidiaries, joint ventures and employees) from claims, demands and damages (actual and consequential) of every kind and nature, known and unknown, arising out of or in any way connected with such disputes. If you are a California resident, you waive California Civil Code §1542, which says: "A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor."

## Access and Interference

The sites contains robot exclusion headers. Much of the information on the sites is updated on a real-time basis and is proprietary or is licensed to eBay by our users or third parties. You agree that you will not use any robot, spider, scraper or other automated means to access the sites for any purpose without our express written permission.

Additionally, you agree that you will not:

- take any action that imposes or may impose (in our sole discretion) an unreasonable or disproportionately large load on our infrastructure;
- copy, reproduce, modify, create derivative works from, distribute, or publicly display any content (except for Your Information) from the sites without the prior expressed written permission of eBay and the appropriate third party, as applicable;
- interfere or attempt to interfere with the proper working of the sites or any activities conducted on the sites; or
- bypass our robot exclusion headers or other measures we may use to prevent or restrict access to the sites.

## Privacy

We do not sell or rent your personal information to third parties for their marketing purposes without your explicit consent. We use your information only as described in the eBay Privacy Policy. We view protection of users' privacy as a very important community principle. We store and process your information on computers located in the United States that are protected by physical as well as technological security devices. You can access and modify the information you provide us and choose not to receive certain communications by signing-in to your account. We use third parties to verify and certify our privacy principles. For a complete description of how we use and protect your personal information, see the eBay Privacy Policy. If you object to your Information being transferred or used in this way please do not use our services.

## Indemnity

You will indemnify and hold us (and our officers, directors, agents, subsidiaries, joint ventures and employees), harmless from any claim or demand, including reasonable attorneys' fees, made by any third party due to or arising out of your breach of this Agreement, or your violation of any law or the rights of a third party.

## No Agency

No agency, partnership, joint venture, employee-employer or franchiser-franchisee relationship is intended or created by this Agreement.

## Notices

Except as explicitly stated otherwise, legal notices shall be served on eBay's national registered agent (in the case of eBay) or to the email address you provide to eBay during the registration process (in your case). Notice shall be deemed given 24 hours after email is sent, unless the sending party is notified that the email address is invalid. Alternatively, we may give you legal notice by mail to the address provided during the registration process. In such case, notice shall be deemed given three days after the date of mailing.

## Resolution of Disputes

If a dispute arises between you and eBay, our goal is to provide you with a

neutral and cost effective means of resolving the dispute quickly. Accordingly, you and eBay agree that we will resolve any claim or controversy at law or equity that arises out of this Agreement or our services (a "Claim") in accordance with one of the subsections below or as we and you otherwise agree in writing. Before resorting to these alternatives, we strongly encourage you to first contact us directly to seek a resolution by going to the About Customer Support help page. We will consider reasonable requests to resolve the dispute through alternative dispute resolution procedures, such as mediation or arbitration, as alternatives to litigation.

**Law and Forum for Disputes** - This Agreement shall be governed in all respects by the laws of the State of California as they apply to agreements entered into and to be performed entirely within California between California residents, without regard to conflict of law provisions. You agree that any claim or dispute you may have against eBay must be resolved by a court located in Santa Clara County, California, except as otherwise agreed by the parties or as described in the Arbitration Option paragraph below. You agree to submit to the personal jurisdiction of the courts located within Santa Clara County, California for the purpose of litigating all such claims or disputes.

**Arbitration Option** - For any claim (excluding claims for injunctive or other equitable relief) where the total amount of the award sought is less than $10,000, the party requesting relief may elect to resolve the dispute in a cost effective manner through binding non-appearance-based arbitration. In the event a party elects arbitration, they shall initiate such arbitration through an established alternative dispute resolution ("ADR") provider mutually agreed upon by the parties. The ADR provider and the parties must comply with the following rules: a) the arbitration shall be conducted by telephone, online and/or be solely based on written submissions, the specific manner shall be chosen by the party initiating the arbitration; b) the arbitration shall not involve any personal appearance by the parties or witnesses unless otherwise mutually agreed by the parties; and c) any judgment on the award rendered by the arbitrator may be entered in any court of competent jurisdiction.

**Improperly Filed Claims** - All claims you bring against eBay must be resolved in accordance with this Resolution of Disputes Section. All claims filed or brought contrary to the Resolution of Disputes Section shall be considered improperly filed. Should you file a claim contrary to the Resolution of Disputes Section, eBay may recover attorneys' fees and costs up to $1000, provided that eBay has notified you in writing of the improperly filed claim, and you have failed to promptly withdraw the claim.

## Additional Terms

The following policies are part of this Agreement and provide additional terms and conditions related to specific services offered on our sites:

**Outage Policy** - http://pages.ebay.com/help/policies/everyone-outage.html

**Prohibited, Questionable & Infringing Item Policy** - http://pages.ebay.com/help/policies/items-ov.html

**Board Usage Policy** - http://pages.ebay.com/help/policies/everyone-boards.html

**Listing Policy** - http://pages.ebay.com/help/policies/listing-ov.html

**Investigations** - http://pages.ebay.com/help/tp/programs-investigations.html

**Real Estate Policy** - http://pages.ebay.com/help/policies/real-estate.html

**Community Content Policy** (covers Reviews, Guides, Blog Entries, Wiki Articles and Member-Created Product Descriptions) - http://pages.ebay.com/help/policies/member-created-content-ov.html

**eBay Groups Guidelines** - http://pages.ebay.com/help/policies/group-guidelines.html

Each of these policies may be changed from time to time. Changes take effect when we post them on the eBay site. When using particular services on our sites, you are subject to any posted policies or rules applicable to services you use through the sites, which may be posted from time to time. All such policies or rules are hereby incorporated into this Agreement.

## General

eBay Inc. is located at 2145 Hamilton Ave., San Jose, CA 95125. If you reside outside of the United States and registered on eBay, the services are offered in countries within the European Union by eBay Europe S.à r.l., located at 22-24 Boulevard Royal, L-2449 Luxembourg, and in all other countries by eBay International AG, located at Helvetiastrasse 15/17, 3005, Bern, Switzerland. If any provision of this Agreement is held to be invalid or unenforceable, such provision shall be struck and the remaining provisions shall be enforced. In our sole discretion, we may assign this Agreement in accordance with the Notices Section. Headings are for reference purposes only and do not limit the scope or extent of such section. Our failure to act with respect to a breach by you or others does not waive our right to act with respect to subsequent or similar breaches. We do not guarantee we will take action against all breaches of this Agreement.

We may amend this Agreement at any time by posting the amended terms on this site. Except as stated elsewhere, all amended terms shall automatically be effective 30 days after they are initially posted. Additionally, we will notify you through the eBay Message Center. This Agreement may not be otherwise amended except in a writing signed by you and us. This Agreement sets forth the entire understanding and agreement between us with respect to the subject matter hereof. The following Sections survive any termination of this Agreement: Fees and Services (with respect to fees owed for our services), Release, Content License, Liability, Indemnity and Resolution of Disputes.

You may report complaints to the Complaint Assistance Unit of the Division of Consumer Services of the California Department of Consumer Affairs by contacting them in writing at 400 R Street, Sacramento, CA 95814, or by telephone at (800) 952-5210.

**Was this page helpful?**
○ Yes   ○ No

How can we improve this page? (optional)

700 characters left

[ Submit Comment ]

EXHIBIT "8"

1  **ERNSTER LAW OFFICES, P.C.**
   **John H. Ernster, Esq., State Bar No. 59338**
2  **Phil J. Montoya, Jr., Esq., State Bar No. 124085**
   70 South Lake Avenue, Suite 750
3  Pasadena, California  91101
   Telephone:   (626) 844-8800
4  Facsimile:   (626) 844-8944

5

6  **Scott Patrick Barlow, Esq., State Bar No. 182295**
   General Counsel
7  4353 Park Terrace Drive
   Westlake Village, California  91361
8  Telephone:   (818) 575-4500
   Facsimile:   (818) 575-4505

9

10 Attorneys for Plaintiff
   Commission Junction, Inc.

11

12                 SUPERIOR COURT OF THE STATE OF CALIFORNIA

13              FOR THE COUNTY OF ORANGE, CENTRAL BRANCH

14

15 COMMISSION JUNCTION, INC.,          )   CASE NO.:  30-2008 00101025
                                       )   ASSIGNED FOR ALL PURPOSES TO:
16                                     )   JUDGE RANDELL L. WILKINSON
              Plaintiff,               )   DEPARTMENT C25
17                                     )
       v.                              )
18                                     )
   THUNDERWOOD HOLDINGS, INC. dba )     **SECOND AMENDED COMPLAINT**
19 KESSLER'S FLYING CIRCUS; TODD )      **FOR DAMAGES**
   DUNNING; BRIAN DUNNING; and  )       1.    Breach of Contract
20 DOES 1 through 50, inclusive,       )   2.    Open Book Account
                                       )   3.    Account Stated
21            Defendants.              )   4.    Reasonable Value
                                       )   5.    Conversion
22                                     )   6.    Unfair Competition
                                       )   7.    Declaratory Relief
23                                     )
                                       )
24 _____ )   *[Unlimited]*

25

26 Plaintiff Commission Junction, Inc. alleges as follows:

27         1.    At all times relevant herein, plaintiff Commission Junction, Inc. ("CJI") was

28 a corporation organized and existing under the laws of the State of Delaware and wholly

                                        1

owned by ValueClick, Inc., a corporation organized and existing under the laws of the
State of California with its principal place of business in the County Los Angeles, State of
California.

    2.    CJI is informed and believes that at all times relevant herein defendant
Kessler's Flying Circus was a California general partnership doing business in the State of
California and the Counties of Los Angeles and Orange.

    3.    CJI is informed and believes that at all times relevant herein defendant
Thunderwood Holdings, Inc. was a California corporation doing business at times as
"Kessler's Flying Circus", in the State of California and the Counties of Los Angeles and
Orange. Thunderwood Holdings, Inc. was at all times relevant a general partner of
Kessler's Flying Circus.

    4.    CJI is informed and believes that at all times relevant herein defendant Todd
Dunning is an individual doing business in the State of California and the Counties of
Los Angeles and Orange. Todd Dunning was at all times relevant a general partner of
Kessler's Flying Circus.

    5.    CJI is informed and believes that at all times relevant herein defendant Brian
Dunning is an individual doing business in the State of California and the Counties of
Los Angeles and Orange. Defendants Kessler's Flying Circus, Thunderwood Holdings,
Inc., Todd Dunning, and Brian Dunning will be referred to hereinafter collectively as
"KESSLER".

    6.    At all times herein mentioned CJI's headquarters and principal place of
business was in Westlake Village, California. The indebtedness described herein was
incurred and payable within the County of Los Angeles, State of California and in the
above judicial district.

    7.    Said obligation is commercial in nature and not based on a retail installment,
sales contract, or a conditional sales contract and is not to subject the provisions of
California <u>Civil Code</u> §1812.10 and/or §2984.4.

/ / /

8.     CJI is ignorant of the true names and capacities of defendants sued herein as DOES 1 through 50, inclusive, and therefore sues said defendants by such fictitious names. CJI will amend this Complaint to allege the true names and capacities of said defendants when they are ascertained. CJI is informed and believes and thereon alleges that each of the fictitiously named defendants is responsible in some manner to pay the obligation described herein and that CJI's losses as alleged herein were proximately caused by said defendants' conduct.

9.     CJI is informed and believes and thereupon alleges that there exists an identity of interest between Thunderwood Holdings, Inc. (on the one hand) and Todd Dunning, Brian Dunning, and DOES 1-5 (on the other hand); that Todd Dunning, Brian Dunning, and DOES 1-5 completely and entirely dominate the affairs of Thunderwood Holdings, Inc., that Thunderwood Holdings, Inc. was and is undercapitalized and acts as a mere shell and alter ego for Todd Dunning, Brian Dunning, and DOES 1-5, and that to recognize the existence of Thunderwood Holdings, Inc. as separate from Todd Dunning, Brian Dunning, and DOES 1-5 would be a fiction and would result in a fraud and an injustice.

10.     CJI is informed and believes and thereupon alleges that each of the defendants herein are principals, agents, and employees of the other(s), acting at all time herein mentioned within the course and scope of their agency and employment and with the consent and permission of the other co-defendants.

## FIRST CAUSE OF ACTION

### (Breach of Contract against KESSLER and DOES 1-20)

11.     CJI incorporates by this reference above paragraphs 1 through 10, inclusive, as if fully set forth herein.

12.     On or about April 14, 2005, CJI and defendants KESSLER, DOES 1-20, and each of them, entered into a written Publisher Service Agreement ("Agreement") whereby CJI agreed to provide goods and services to and for KESSLER. A true and correct copy of

1 the parties' Agreement is attached hereto as Exhibit "A" and incorporated herein by this

2 reference. While Exhibit "A" is the Agreement defendants KESSLER, DOES 1-20, and

3 each of them, entered into the with CJI, it does not show the parties' signatures inasmuch

4 as defendants KESSLER, DOES 1-20, and each of them, chose to enter into the Agreement

5 via the Internet and the defendants have a copy of the Agreement printed that day.

6       13.    The Agreement includes the following provisions:

7           [KESSLER] "may not place Links to an Advertiser's Web Site or Web Site

8           content in third party newsgroups, message boards, blogs, unsolicited email

9           and other types of spam, link farms, counters, chatrooms, or guestbooks."

10           Agreement at Section 1(d)(i);

11           [KESSLER] "shall not cause any Transactions to be made that are not in

12           good faith, including, but not limited to, using any device, program, robot,

13           Iframes, or hidden frames." Agreement at Section 1(d)(ii);

14           "None of Your [KESSLER's] promotional activities may infringe an

15           Advertiser's proprietary rights CJ's [CJI's] proprietary rights, or a third

16           party's proprietary rights. Agreement at Section 1(d)(iii);

17           "You [KESSLER] represent and warrant that all promotional means used by

18           You [KESSLER] will not contain objectionable content (including but not

19           limited to content that is misleading, libelous, defamatory, obscene, violent,

20           bigoted, hate-oriented, illegal, and/or promoting illegal goods, services or

21           activities), and that You [KESSLER] will not mislead others. You

22           [KESSLER] agree to: (i) use ethical and legal business practices, (ii) comply

23           with the Advertisers' Program terms and this Agreement, (iii) maintain a

24           privacy policy on Your Web site and for any non-Web site based promotional

25           method made available to Visitors, and (iv) designate Your [KESSLER]

26           Publisher Account as "special" if You [KESSLER] promote an Advertiser(s)

27           by any means other than displaying a Link to the Advertiser on Your

28           [KESSLER] Web site. CJ [CJI] must approve all of Your [KESSLER]

1  promotional activities and may deem Your [KESSLER] promotional
2  activities inappropriate and a material breach of this Agreement in CJ's
3  [CJI's] sole discretion." Agreement at Section 2(b); and
4  "You [KESSLER] represent and warrant that: (i) You [KESSLER] have all
5  appropriate authority to operate, and to any and all content on, Your
6  [KESSLER] Web site(s); (ii) You [KESSLER] have all appropriate authority
7  in any promotional method you may choose to use." Agreement at
8  Section 7(c)(ii).

9  14.  CJI has performed all conditions, covenants, and promises required on its
10  part to be performed in accordance with the terms and conditions of said Agreement.

11  15.  CJI is informed and believes, and on that basis alleges, that beginning in
12  April of 2007 and continuing thereafter, defendants KESSLER, DOES 1-20, and each of
13  them, breached the Agreement by, *inter alia*, the following:  KESSLER was providing
14  third parties with the ability to place widgets on Websites that KESSLER did not
15  own/operate without permission from the website owners to do so; KESSLER's
16  WhoLinked provided a widget used by bloggers and webmasters to display a list of
17  high-ranking sites linking to their site; KESSLER's MySpaceMaps provided widgets users
18  placed on social networking profiles, including MySpace; and KESSLER did not comply
19  with the blog sites' terms and, importantly, the following MySpace terms, which prohibit
20  commercial activity without consent:

21  "Non-commercial Use by Members.  The MySpace Services are for the
22  personal use of Members only and may not be used in connection with any
23  commercial endeavors except those that are specifically endorsed or
24  approved by MySpace.com. Illegal and/or unauthorized use of the MySpace
25  Services, including collecting usernames and/or email addresses of Members
26  by electronic or other means for the purpose of sending unsolicited email or
27  unauthorized framing of or linking to the MySpace Website is prohibited.
28  Commercial advertisements, affiliate links, and other forms of solicitation

may be removed from Member profiles without notice and may result in termination of Membership privileges. Appropriate legal action will be taken for any illegal or unauthorized use of the MySpace Services."

"Content/Activity Prohibited. The following is a partial list of the kind of Content that is illegal or prohibited to post on or through the MySpace Services. MySpace.com reserves the right to investigate and take appropriate legal action against anyone who, in MySpace.com's sole discretion, violates this provision, including without limitation, removing the offending communication from the MySpace Services and terminating the Membership of such violators. Prohibited Content includes, but is not limited to Content that, in the sole discretion of MySpace.com: ... involves commercial activities and/or sales without our prior written consent such as contests, sweepstakes, barter, advertising, or pyramid schemes."

16. CJI is informed and believes, and on that basis alleges, that beginning in April of 2007 and continuing thereafter, defendants KESSLER, DOES 1-20, and each of them, further breached the Agreement by, *inter alia*, inflating traffic, forcing cookies, infringing on other's proprietary rights, providing links and widgets to wrongfully promote and/or force traffic to ebay.com, and promoting objectionable content as that is defined in the Agreement. In addition, such actions by KESSLER, DOES 1-20, and each of them, were fraudulent, unfair, deceptive, and misleading advertising and business practices which are also breaches of the Agreement.

17. Among other damaging results, these actions by defendants KESSLER, DOES 1-20, and each of them, resulted in alleged violations of CJI's agreements with eBay, Inc. which further resulted in the amount of $565,517.84 not being paid by eBay, Inc. to CJI despite CJI paying that amount to defendants KESSLER, DOES 1-20, and each of them.

18. Pursuant to Section 3 of the Agreement, CJI has a right to a return from defendants KESSLER, DOES 1-20, and each of them of the wrongful payment made to

defendants KESSLER, DOES 1-20, and each of them.

19.   Since June of 2007, CJI has requested that defendants KESSLER, DOES 1-20, and each of them, perform their obligation, under the Agreement, by returning the inadvertent payment of $565,517.84 made to defendants KESSLER, DOES 1-20, and each of them, which payment was not due to defendants based on their conduct as set forth herein above.  True and correct copies of certain, but not all, requests for return of the $565,517.84 are attached hereto collectively as Exhibit "B" and incorporated herein by this reference.

20.   Defendants KESSLER, DOES 1-20, and each of them, further breached the Agreement by failing and refusing to pay the sum owed as set forth herein above.

21.   In addition, defendants KESSLER, DOES 1-20, and each of them, breached the implied covenant of good faith and fair dealing by, *inter alia*, the conduct set forth herein above, failing and refusing to pay the sum owed, and failing to respond to repeated requests for payment.

22.   No part of that sum has been paid, and is now due, owing and unpaid from defendants, and each of them, to CJI, the sum of $565,517.84 as of June 15, 2007, and interest thereon.

23.   As a further result of the breach by defendants KESSLER, DOES 1-20, and each of them, CJI has retained counsel and has incurred, and will incur, attorneys' fees and expenses in an amount according to proof, which it is entitled to recover pursuant to the Agreement.

## SECOND CAUSE OF ACTION

(For Open Book Account Against All Defendants)

24.   CJI incorporates by reference the allegations of paragraphs 1 through 23 above as though fully set forth herein.

25.   CJI is informed and believes, and thereon alleges, that within the last year, defendants KESSLER, DOES 1-20, and each of them, became indebted to CJI on an open

book account for a balance due in the sum of $565,517.84 as of June 15, 2007 for goods and services furnished and delivered to defendants, and each of them, at their request.

26. No part of this sum has been paid, although demand therefor has been made, and the sum of $565,517.84 is now due and owing from said defendants, and each of them, to CJI.

## THIRD CAUSE OF ACTION

### (For Account Stated Against All Defendants)

27. CJI incorporates by reference the allegations of paragraphs 1 through 26 above as though fully set forth herein.

28. CJI is informed and believes, and on that basis alleges, that beginning in June of 2007 and continuing thereafter, there was an account stated between CJI and defendants, and each of them, in which the sum of $565,517.84 was agreed on as the balance due CJI.

29. No part of such sum has been paid, although demand therefor has been made, and the sum of $565,517.84 is now due and owing from said defendants, and each of them, to CJI.

## FOURTH CAUSE OF ACTION

### (For Reasonable Value Against All Defendants)

30. CJI incorporates by reference the allegations of paragraphs 1 through 29 above as though fully set forth herein.

31. CJI is informed and believes, and on that basis alleges, that beginning in June 2007 and continuing thereafter defendants, and each of them, became indebted to CJI in the reasonable sum of $565,517.84 for goods and services furnished to defendants, and each of them, at their request, and that defendants promised to pay the reasonable value for goods and services furnished.

32. No part of such sum has been paid, although demand therefor has been made, and the sum of $565,517.84 is now due and owing from said defendants, and each of them,

8

1 | to CJI.

2

3 | <u>FIFTH CAUSE OF ACTION</u>

4 | (Conversion against All Defendants)

5 | 33. CJI incorporates by this reference above paragraphs 1 through 32, inclusive,

6 | as if fully set forth herein.

7 | 34. At all times relevant, CJI had a right of ownership of its $565,517.84.

8 | However, based on the wrongful conduct by and activities of defendants KESSLER, DOES

9 | 1-50, and each of them, as more fully described in Paragraphs 12-18 herein above, that sum

10 | was wrongfully delivered to defendants KESSLER, DOES 1-50, and each of them.

11 | 35. In June of 2007, CJI sent a payment of $565,517.84 to defendants

12 | KESSLER, DOES 1-50, and each of them. As set forth herein above, defendants

13 | KESSLER, DOES 1-50, and each of them, were not owed the described sum of

14 | $565,517.84 or at all.

15 | 36. On numerous occasions, CJI has requested the return of the $565,517.84

16 | from defendants KESSLER, DOES 1-50, and each of them, however, said defendants have

17 | refused to return CJI's property and have converted it as their own. The actions of

18 | defendants KESSLER, DOES 1-50, and each of them, wrongfully and intentionally

19 | interfered with CJI's right of possession of the $565,517.84.

20 | 37. Because defendants KESSLER, DOES 1-50, and each of them, have

21 | wrongfully exercised possession of CJI's property, there is now due, owing and unpaid

22 | from defendants, and each of them, to CJI, the sum of $565,517.84 as of June 15, 2007,

23 | and interest thereon.

24

25 | <u>SIXTH CAUSE OF ACTION</u>

26 | (Unfair Competition against All Defendants)

27 | 38. CJI incorporates by this reference above paragraphs 1 through 37, inclusive,

28 | as if fully set forth herein.

39.     As more fully described in Paragraphs 12-18 herein above, defendants KESSLER, DOES 1-20, and each of them, engaged in unfair, deceptive, and misleading advertising and business practices.  Such conduct by defendants KESSLER, DOES 1-20, and each of them, violates California <u>Business and Professions Code</u> §17200 *et al*.

40.     Indeed, the actions of defendants KESSLER, DOES 1-20, and each of them, were unfair, deceptive, and misleading advertising and business practices such that the United States Federal Bureau of Investigation and/or United States Attorney initiated a Grand Jury investigation into said practices and subpoenaed CJI's business records regarding defendants KESSLER, DOES 1-20, and each of them.

41.     Since July of 2007, CJI has requested that defendants KESSLER, DOES 1-20, and each of them, halt its wrongful actions and return CJI's inadvertent payment of $565,517.84 made to defendants KESSLER, DOES 1-20, and each of them, which payment was not due to defendants based on their conduct as set forth herein above.

42.     Defendants KESSLER, DOES 1-20, and each of them, failed to halt their wrongful conduct as herein above alleged and have failed and refused to pay the outstanding sum of $565,517.84.

43.     No part of that sum has been paid, and is now due, owing and unpaid from defendants, and each of them, to CJI, the sum of $565,517.84 as of June 15, 2007, and interest thereon.

## SEVENTH CAUSE OF ACTION

### (Declaratory Relief against All Defendants)

44.     CJI incorporates by this reference above paragraphs 1 through 43, inclusive, as if fully set forth herein.

45.     An actual controversy has arisen and now exists between CJI and defendants KESSLER and DOES 1-50, inclusive.  CJI contends that defendants KESSLER and DOES 1-50, inclusive, engaged in unfair, deceptive, and misleading advertising and business practices and are obligated to pay CJI the sum of $565,517.84.  CJI is informed

1    and believes and thereon alleges that defendants KESSLER and DOES 1-50, inclusive,

2    contend otherwise.

3        46.    It would be fair, just, and appropriate for this Court to determine the rights

4    and obligations of the parties as to this matter, and declaratory relief is necessary and

5    appropriate at this time so that CJI may ascertain its rights and duties and have ascertained

6    defendants' obligations.

7        47.    CJI therefore seeks a declaratory judgment providing that defendants

8    KESSLER and DOES 1-50, inclusive, are obligated to provide CJI with the sum of

9    $565,517.84 as a result of the inadvertent payment and the defendants' conduct as

10   described herein above.

11

12       WHEREFORE, CJI prays for judgment in its favor and against defendants

13   KESSLER and DOES 1-50, and each of them, as follows on the causes of action:

14                    ON THE FIRST CAUSE OF ACTION

15       1.    For general and specific damages according to proof, including attorneys'

16   fees, costs, expenses, and interest thereon;

17                    ON THE SECOND CAUSE OF ACTION

18       2.    For general and specific damages according to proof, including attorneys'

19   fees, costs, expenses, and interest thereon;

20                    ON THE THIRD CAUSE OF ACTION

21       3.    For general and specific damages according to proof, including attorneys'

22   fees, costs, expenses, and interest thereon;

23                    ON THE FOURTH CAUSE OF ACTION

24       4.    For general and specific damages according to proof, including attorneys'

25   fees, costs, expenses, and interest thereon;

26                    ON THE FIFTH CAUSE OF ACTION

27       5.    For general and specific damages according to proof, including attorneys'

28   fees, costs, expenses, and interest thereon;

SECOND AMENDED COMPLAINT FOR DAMAGES

6.    For general and specific damages according to proof, including attorneys' fees, costs, expenses, and interest thereon;

## ON THE SEVENTH CAUSE OF ACTION

7.    For a judicial declaration that defendants KESSLER and DOES 1-50, inclusive, are obligated to provide CJI with the sum of $565,517.84 as a result of the inadvertent payment and the defendants' conduct as described herein above.

## ON ALL CAUSES OF ACTION

8.    For costs of suit incurred herein; and

9.    For such other and further relief, legal and/or equitable, as the Court may deem just and proper.

Dated:  May 15, 2008          ERNSTER LAW OFFICES, P.C.

By: _____
      Phil J. Montoya, Jr.
    Attorneys for Plaintiff
    Commission Junction, Inc.

# EXHIBIT "A"

This Publisher Service Agreement ("Agreement") is made by and agreed to between Commission Junction, Inc., a Delaware corporation, located at 530 East Montecito Street, Santa Barbara, CA 93103, USA ("CJ"), and you ("You"). As an application service provider, CJ facilitates "Performance Marketing Programs" by providing services ("Network Service") via the Internet. A "Performance Marketing Program" ("Program") is where a person, entity, affiliate or its agent, operating "Web site(s)" (internet domain, or a portion of a domain) and/or other promotional methods to drive traffic to another's Web site or Web site content ("Publisher") may earn financial compensation ("Payouts") for "Transactions" (actions by Visitors as defined by the Advertiser) referred by such Publisher via an action made by a "Visitor" (any person or entity that is not the Publisher or the Publisher's agent) through an internet connection ("Link") to a Web site or Web site content operated by another person or entity ("Advertiser") from an Advertiser authorized promotional method used by such Publisher. The Advertiser compensates the Publisher, in accordance with this Agreement and the Program Payout specifications.

### 1. Participation in Programs.
**(a) Acceptance by Advertiser.** During this Agreement You may apply to Advertiser Programs for the opportunity to earn Payouts by promoting Advertisers in accordance with the Advertiser's Program terms and complying with this Agreement. Upon approval by the Advertiser for acceptance into its Program, You may display (and remove) Links to Advertiser's Web site or Web site content in accordance with the Advertiser's Program terms and this Agreement. An Advertiser's acceptance of You extends only to the entity, or individual, that enters into this Agreement with CJ.
**(b) Program Terms.** The details of an Advertiser's Program shall be available through the Network Service. Transactions qualifying for a Payout are defined by the Advertiser. Advertisers may change any Payout rate upon no less than 7 days written notice through the Network Service with effect from the 8th day (or such later date as specified by Advertiser).
**(c) Additional Terms.** Publishers and Advertisers may enter into direct contractual relationships through the apply to join process in the form of a click-through agreement hosted by CJ ("Click-through Agreement") or in the form of an offer made to You by Advertiser via the members' area on the Network Service ("Offer"). It is Your obligation to review and accept or decline a Click-through Agreement or Offer when such is presented to You. If accepted by You, compliance with the Click-through Agreement or Offer is solely Your responsibility. The terms and conditions of the Click-through Agreement or Offer may supersede or conflict with this Agreement and shall apply only with respect to Your relationship with that particular Advertiser.
**(d) Prohibited Uses of Links.**
(i) **Locations.** You may not place Links to an Advertiser's Web site or Web site content in third party newsgroups, message boards, blogs, unsolicited email and other types of spam, link farms, counters, chatrooms, or guestbooks. Publishers using IRC channels, instant messages or similar Internet resources must designate their program as special requiring manual review and acceptance by the Advertiser.
(ii) **Non-Bona Fide Transactions.** You must promote Advertisers such that You do not mislead the Visitor, and such that the Links deliver bona fide Transactions by the Visitor to Advertiser from the Link. You shall not cause any Transactions to be made that are not in good faith, including, but not limited to, using any device, program, robot, iframes, or hidden frames. You may or may not be compensated for Transactions where You or Your agent are the Visitor. Multiple Leads from the same individual, entity or IP address may be considered non-bona fide Transactions. You shall not earn Payouts for non-bona fide Transactions.
(iii) **Infringement.** None of Your promotional activities may infringe an Advertiser's proprietary rights (including but not limited to trademark rights), CJ's proprietary rights, or a third party's proprietary rights.
**(e) Updating Links.** If Links to Advertiser are not dynamically updated through the Network Service, upon notification You are obligated to update an Advertiser's Links in order to earn Payouts.

### 2. Publisher Obligations to CJ.
**(a) Accurate, Up-to-Date Information.** You agree to provide CJ and Advertiser with accurate information about You and Your promotional methods, and to maintain up-to-date "Account" information (such as contact information, Web sites used, etc.). In Your Account, You must accurately, clearly and completely describe all promotional methods by selecting the appropriate descriptions and providing additional information when necessary. Some promotional methods will be designated by the system as "special". Special programs are linked to promotional methods and practices considered unique and require manual approval and acceptance by the Advertiser. CJ reserves the right to define any program as special.
**(b) Use of Links.** You represent and warrant that all promotional means used by You will not contain objectionable content (including but not limited to content that is misleading, libelous, defamatory, obscene, violent, bigoted, hate-oriented, illegal, and/or promoting illegal goods, services or activities), and that You will not mislead others. You agree to: (i) use ethical and legal business practices, (ii) comply with the Advertisers' Program terms and this Agreement, (iii) maintain a privacy policy on Your Web site for any non-Web site based promotional method made available to Visitors, and (iv) designate Your Publisher Account as "special" if You promote an Advertiser(s) by any means other than displaying a Link to the Advertiser on Your Web site. CJ must approve all of Your promotional activities and may deem Your promotional activities inappropriate and a material breach of this Agreement in CJ's sole discretion. Our network quality department reviews publisher conduct and any suspected fraudulent, abusive or

otherwise illegal content or activity by You through Your promotional methods, or that is perpetrated through use of the Network Service, is grounds for immediate termination of this Agreement or deactivation of Your Account.

(c) **Promotional Methods.** You represent and warrant that You will not engage in and/or facilitate spamming, indiscriminate advertising or unsolicited commercial email or otherwise fail to comply with the CAN SPAM Act of 2003 (Public Law 108-187 or any successor legislation), and/or any other laws and/or regulations that govern email marketing and/or communications. You represent and warrant that You will not engage in pop-up or pop-under advertising using any means involving third party properties and/or services (software). Pop up/unders are acceptable on a first party basis only when triggered by Your site content /site visit or by downloadable software applications for which You are the owner/operator. Pop up/unders delivered through downloadable software cannot engage in means that force clicks or perform redirects, or pop over a pay-per-click listing or natural search results. Pop up/unders must honor the CJ Publisher Code of Conduct requirements (as such requirements may be modified from time to time), including but not limited to: (i) installation requirements, (ii) enduser agreement requirements, (iii) afsrc=1 requirements; (iv) requirements prohibiting usurpation of a Transaction that might otherwise result in a Payout to another Publisher (e.g. by purposefully detecting and forcing a subsequent click-through on a link of the same Advertiser) and (v) non-interference with competing advertiser/ publisher referrals.

(d) **Personally Identifiable Information of Visitors.** You represent and warrant that You will not enable the Tracking Code to collect personally identifiable information of Visitors that would allow CJ to personally identify Visitors.

(e) **Privacy.** You must conspicuously post Your privacy policy on Your Web site and otherwise make it available to all Visitors. Your privacy policy must comply with all laws and regulations regarding the privacy of Visitor information, be commercially reasonable, and fully and accurately disclose Your collection and use of Visitor information. You must fully and accurately disclose Your use of third party technology, including CJ's tracking technology, use of cookies and options for discontinuing use of such cookies.

(f) **Applicable Codes and Code Maintenance.** In order for CJ to record the tracking of Visitors' Transactions resulting from clicks on Links to Advertisers promoted by You, You must include and maintain a CJ "Tracking Code" within the Advertiser's Links. All Advertiser Links and all advertisements ("Ad Content") must be in a Network Service compatible format.

(g) **Usage and Security of Account.** You shall be responsible for all usage and activity on Your account and for loss, theft or unauthorized disclosure of Your password (other than through CJ's negligent or willful conduct or omission). You shall provide CJ with prompt written notification of any known or suspected unauthorized use of Your Account or breach of the security of Your Account.

3. **CJ's Services.**

(a) **Tracking Transactions and Payouts.** CJ shall determine (where possible) actual Payouts that should be credited to Your Account. CJ may, in CJ's sole discretion, apply an estimated amount of Payouts, if: (i) You are referring Visitors to Advertiser as verified by clicks through Links to Advertiser with CJ Tracking Code, (ii) where there is an error in Advertiser's transmission of Tracking Code data to CJ, and (iii) where CJ is able to utilize a historical analysis of Your promotion of Advertiser to determine an equitable amount of estimated Payouts.

(b) **Charge-backs.** An Advertiser may apply, or CJ may apply, a debit to Your Account in an amount equal to a Payout previously credited to Your Account in circumstances of : (i) product returns; (ii) duplicate entry or other clear error; (iii) non-bona fide Transactions; (iv) non-receipt of payment from, or refund of payment to, the Visitor by the Advertiser; or (v) Publisher failure to comply with Advertiser's Program terms or other agreement with Advertiser ("Charge-back"). Charge-backs may be applied to Your Account at any time, including previous payment cycles.

(c) **Access to Tracking and Reporting Tools.** CJ shall provide You with access to tracking and reporting tools, and to support services. From time to time CJ may offer optional services for a fee. Fees for such optional services are at CJ's then-current published rates or as may be quoted by CJ, and are payable in advance or may be off-set against Your positive Account balance (at CJ's discretion). Tracking detail regarding Visitor Transactions is not available on a real-time basis for all Advertisers and there may be reporting delays regarding Transactions for some Advertisers. CJ may make available, for fees that CJ shall publish from time-to-time, enhanced reporting capabilities and other services that are not included in the standard Network Service.

(d) **Support.** Support for your program is available on-line through the "Contact Us" area in the CJ Account Manager, which allows You to categorize and describe Your issue. Online help also allows You to check the status of all issues through the "Check Question Status" feature. Phone support may also be available during operating hours, except holidays.

(e) **Facilitating Payment of Payouts.** Subject to other provisions in this Agreement, CJ shall credit Your Account with a Payout for each qualifying Transaction in accordance with the Advertiser's Payout rate and Program terms for the relevant Transaction. On the 20th day of each calendar month, CJ will issue to You any positive balance in Your Account for Transactions reported for the previous month, provided Your Account balance exceeds the required "Minimum Account Balance." CJ shall have no obligation to make payment of any Payouts for which CJ has not received payment from the relevant Advertiser of all monies due to CJ (including for all Payouts owed by such Advertiser to all of such Advertiser's Publishers). If CJ elects, in its own discretion, not to make payment to You for amounts not received from an Advertiser, those amounts shall not be included in the Minimum Balance Amount. Your recourse for any earned Payouts not paid to You shall be to make a claim against the relevant Advertiser(s), and CJ disclaims any and all liability for such payment. You may elect to receive payment in any of the currencies that CJ supports (as may be amended by CJ). The conversion rate shall be determined in accordance with CJ's operating standards using the rates prevailing upon the date that payment is made to You, or upon the basis of historical

conversion rates if rates are unavailable. The number or amount of Transactions, credits for Payouts, and debits for Charge-backs, as calculated by CJ, shall be final and binding on You.
(f) **Dormant Accounts.** If Publisher's Account has not been credited with a valid, compensable Transaction that has not been Charged-back during any rolling, six consecutive calendar month period ("Dormant Account"), a dormant account fee at CJ's then-current rate shall be applied to Publisher's Account each calendar month that Publisher's Account remains an open yet Dormant Account or until Your Account balance reaches a zero balance, at which time the Account shall become deactivated. Transactions will not be counted if the Transaction subsequently becomes a Charge-back.
(g) **Negative Accounts.** You may have a negative balance if Your Account is debited amounts equivalent to previous Payouts for Charge-backs and You do not have an adequate Account balance to cover the Charge-back amounts. When You have a negative balance, You must immediately remit payment to CJ in an amount sufficient to bring Your Account to a zero balance, or Your Account is subject to 1.5% interest per month, compounded monthly.

**4. Proprietary Rights.**
(a) **Linking to Advertisers.** For each Advertiser's Program that You have been accepted to, the Advertiser is granting to You the right to display and Link to the Advertiser's Web site or Web site content in accordance with the Advertiser's Program terms for the limited purposes of Promoting the Advertiser's Program, subject to the terms and conditions of this Agreement. Your use of the Link signifies Your agreement to refrain from copying or modifying any icons, buttons, banners, graphics files or content contained in the Link, including but not limited to refraining from removing or altering any copyright or trademark notices. As between CJ and Publisher, CJ owns all rights in and to all information regarding the Visitors that You refer to Advertisers through CJ.
(b) **CJ's Use of Your Marks.** You authorize CJ to utilize Your trademarks, service marks, tradenames, and/or copyrighted material that You provide to CJ through Your Account to promote Your participation in the Network Services.
(c) **Your Use of CJ's Proprietary Rights.** You agree that Your use of any CJ Web site (such as www.cj.com) and Your use of any CJ trademarks, service marks, tradenames, and/or URLs is subject to the license and terms of use that are available from such Web site ("Terms of Use"). You explicitly agree not to adopt or use in any manner any trademarks, service marks, tradenames, and/or URLs that are the same or confusingly similar to, or are combined with, those of CJ.
(d) **Retention of Rights.** All proprietary rights of Advertisers, You, and CJ, and all goodwill arising as a result of such rights, inure to the benefit of such owner.
(e) **No Challenge to CJ's/Advertiser's Proprietary Rights.** You acknowledge that You obtain no proprietary rights in CJ's trademarks, service marks, tradenames, URLs, copyrighted material, patents, and patent applications, and agree not to challenge CJ's proprietary rights. You acknowledge that You obtain no proprietary rights in Your Advertisers' proprietary rights, and agree not to challenge such Advertiser's proprietary rights.

**5. Confidentiality.**
(a) **Obligations.** You or CJ may provide the other with information that is confidential and proprietary to that party or a third party, as is designated by the disclosing party or that is reasonably understood to be proprietary and/or confidential ("Confidential Information"). The receiving party agrees to make commercially reasonable efforts, but in no case no less effort than it uses to protect its own Confidential Information, to maintain the confidentiality of and to protect any proprietary interests of the disclosing party. Confidential Information shall not include (even if designated by a party) information: (i) that is or becomes part of the public domain through no act or omission of the receiving party; (ii) that is lawfully received by the receiving party from a third party without restriction on use or disclosure and without breach of this Agreement or any other agreement without knowledge by the receiving party of any breach of fiduciary duty, or (iii) that the receiving party had in its possession prior to the date of this Agreement. Upon termination of this Agreement, You must destroy or return to CJ any Confidential Information provided by CJ to You under this Agreement.
(b) **Provision of Info to Advertisers/Third Parties.** You agree that CJ may, but is not obligated to, provide Your email address(es) and basic Publisher Account detail (including but not limited to Your address, phone and fax number, Web site name, the date the website or subscription email first entered into operation, and visitor demographics) to Advertisers. CJ may provide any and all Visitor, Transaction and/or Tracking Code data to the Advertiser to which You referred such Visitor, and to any third party in CJ's sole discretion, including but not limited to all regulatory, legislative and judicial bodies, and pursuant to allegations and claims of proprietary rights infringement. CJ reserves the right to be able to utilize Tracking Code data provided to it, which may include: information about Your performance statistics, to analyze Network Service trends, monitor Network Service efficiencies, maintain the integrity of the tracking code, promote Network Service capabilities and efficiencies, and promote You and Your Web performance to Advertisers.

**6. Term, Termination, Deactivation and Notices.**
(a) **Term.** This Agreement shall commence upon Your indication that You have accepted this Agreement by providing the required information and 'clicking through' the acceptance button on the CJ Web site and shall continue until terminated in accordance with the terms of this Agreement. This Agreement may be terminated by either party upon 15 days notice. This Agreement may be terminated immediately upon notice for Your breach of this Agreement. Your Account may be deactivated during investigation of breach of this Agreement. If this Agreement is

terminated based upon Your breach, You shall not be eligible to enter into a new click-through Publisher Service Agreement with CJ, and any attempt to do so shall be null and void.

(b) **Termination by Advertiser.** An Advertiser may terminate You, one of Your Web sites, or Your ability to use a promotional method, from the Advertiser's Program for any or no reason, upon 7 days written notice with effect from the 8th day. Additionally, Advertiser may terminate You from the Advertiser's Program for breach of a third party's proprietary rights, and/or diluting, tarnishing or blurring an Advertiser's trademarks, tradenames, and/or service marks, or for Your material breach of the Advertiser's Program terms or of this Agreement.

(c) **Termination or Deactivation by CJ.** CJ may terminate You, one of Your Web sites, or Your use of a promotional method, from an Advertiser's Program, at any time in CJ's sole discretion. Breach of any Section of this Agreement is cause for immediate termination from an Advertiser's Program and/or termination of this Agreement, and may result in Chargeback of one or more Payouts. CJ may temporarily deactivate or terminate Your Account if: (i) You or Your agent are responsible for the improper functioning of Ad Content, or if You otherwise interfere with and/or fail to maintain the Tracking Code; (ii) Your Account has not been logged into and/or there have been no Transactions credited to Your Account for any 30 day period; (iii) You maintain a negative balance in Your Account; (iv) CJ determines You are diluting, tarnishing or blurring CJ's proprietary rights; (v) You begin proceedings to challenge CJ's proprietary rights; or (vi) a third party (including a CJ Advertiser) disputes Your right to use any Link, domain name, trademark, service mark, trade dress, or right to offer any service or good offered on Your Web site, or through any of Your promotional means. Upon termination of this Agreement, or in case of deactivation of Your Account, You shall no longer accrue Payouts in Your Account, including but not limited to subsequent sales and/or Leads for click-throughs that occurred prior to termination.

(d) **Termination of Programs and Offers.** Programs and Offers may be discontinued at any time.

(e) **Notices.** Except as provided elsewhere herein, both parties must send all notices relating to this Agreement to: (i) for CJ, via registered mail, return receipt requested or via an internationally recognized express mail carrier to Commission Junction, Inc., Attn: Legal Dept., 530 East Montecito Street, Santa Barbara, CA 93103 USA (effective upon actual receipt); and, (ii) for You, at the email or physical address listed on Your Account (effective upon sending as long as CJ does not receive an error message regarding delivery of the email) or five (5) days after mailing).

(f) **Post-termination.** Upon termination of this Agreement, any outstanding payments shall be paid by CJ to You within 90 days of the termination date, and any outstanding debit balance shall be paid by You to CJ within 30 days of termination of this Agreement. All payments are subject to recovery for Charge-backs. Upon termination of this Agreement, any permissions granted under this Agreement will terminate, and You must immediately remove all Links to Advertiser(s). Provisions of this Agreement that by their nature and context are intended to survive the termination of this Agreement shall survive the termination of this Agreement to the extent that and as long as is necessary to preserve a party's rights under this Agreement that accrued prior to termination.

## 7. Representations, Warranties, Disclaimers and Limitations.

(a) **Business Operations.** Each party will make reasonable commercial efforts to keep its Web site operational during normal business hours. However, the parties agree that it is normal to have a certain amount of system downtime and agree not to hold each other or Your Advertisers liable for any of the consequences of such interruptions. CJ may modify the Network Service, or discontinue providing the Network Service, or any portion thereof, at any time.

(b) **Authority.** Each party represents and warrants to the other party as to itself that the person executing this Agreement is authorized to do so on such party's behalf. IF YOU ARE AN INDIVIDUAL, YOU REPRESENT AND WARRANT THAT YOU WERE AT LEAST 18 YEARS OF AGE ON THE EFFECTIVE DATE OF THIS AGREEMENT.

(c) **Non-infringement Warranties.** You represent and warrant that: (i) You have all appropriate authority to operate, and to any and all content on, Your Web site(s); (ii) You have all appropriate authority in any promotional method you may choose to use; (iii) Your Web site(s) and Your promotional methods do not and will not infringe a third party's, a CJ Advertiser's, or CJ's, proprietary rights; and (iv) You shall remain solely responsible for any and all Web sites owned and/or operated by You and all of Your promotional methods. CJ may or may not review all content on Your Web site or used by You in Your promotional methods.

(d) **Compliance with Laws.** You are responsible for compliance with the requirements of all relevant legislation (including subordinate legislation and the rules of statutorily recognized regulatory authorities) in force or applicable in the United States or in any other applicable territory, and warrant that no promotion method used by You or the content of Your Web site(s) will render CJ liable to any proceedings whatsoever.

(e) **Limitation of Liabilities.** ANY OBLIGATION OR LIABILITY OF CJ UNDER THIS AGREEMENT SHALL BE LIMITED TO THE TOTAL OF YOUR PAYOUTS PAID TO YOU BY CJ UNDER THIS AGREEMENT DURING THE YEAR PRECEDING THE CLAIM. NO ACTION, SUIT OR PROCEEDING SHALL BE BROUGHT AGAINST THE OTHER PARTY TO THIS AGREEMENT MORE THAN ONE YEAR AFTER THE TERMINATION OF THIS AGREEMENT. YOU AGREE THAT CJ SHALL NOT BE LIABLE TO YOU, OR ANY THIRD PARTY (INCLUDING BUT NOT LIMITED TO A CLAIM BY ANOTHER PUBLISHER OR AN ADVERTISER OF THE NETWORK SERVICE), FOR ANY CONSEQUENTIAL, EXEMPLARY, SPECIAL, INCIDENTAL, OR PUNITIVE DAMAGES, INCLUDING, BUT NOT LIMITED TO, LOSS OF GOODWILL, LOST PROFITS, BUSINESS INTERRUPTION, LOSS OF PROGRAMS OR OTHER DATA, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES OR CLAIM.

(f) **Disclaimer of Warranties.** TO THE FULLEST EXTENT PERMISSIBLE PURSUANT TO APPLICABLE LAW, CJ DISCLAIMS ALL WARRANTIES IMPLIED, INCLUDING, BUT NOT LIMITED TO, (A) MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR NON-INFRINGEMENT OF THIRD PARTY RIGHTS, (B) THAT THERE ARE

NO VIRUSES OR OTHER HARMFUL COMPONENTS, (C) THAT CJ'S SECURITY METHODS WILL BE SUFFICIENT, (D) REGARDING CORRECTNESS, ACCURACY, OR RELIABILITY, OR (D) AGAINST INTERFERENCE WITH ENJOYMENT OF THE PUBLISHER'S INFORMATION OR WEB SITE. ALL 'INFORMATION' AND 'COMPUTER PROGRAMS' PROVIDED TO YOU IN THE COURSE OF THIS AGREEMENT ARE PROVIDED WITH ALL FAULTS, AND THE ENTIRE RISK AS TO SATISFACTORY QUALITY, PERFORMANCE, ACCURACY, AND EFFORT IS WITH YOU. CJ IS, UNDER NO CIRCUMSTANCES, RESPONSIBLE FOR THE PRACTICES, ACTS OR OMISSIONS OF ANY ADVERTISER OR PUBLISHER, OR SUCH ADVERTISER OR PUBLISHER'S WEB SITE(S), AND/OR THE CONTENT OF AN ADVERTISER'S WEB SITE OR THAT AN ADVERTISER MAKES AVAILABLE THROUGH THE NETWORK SERVICE.

(g)  Remedies.  No remedy or election shall be deemed exclusive but shall, wherever possible, be cumulative with all other remedies at law or in equity.

(h)  Benefit of the Bargain. THE PROVISIONS OF THIS SECTION 7 ARE AN ESSENTIAL ELEMENT OF THE BENEFIT OF THE BARGAIN REFLECTED IN THIS AGREEMENT.

8.  Publisher's Indemnification Obligations.  Publisher shall defend, indemnify and hold CJ and Advertisers harmless against all claims, suits, demands, damages, liabilities, losses, penalties, interest, settlements and judgments, costs and expenses (including attorneys' fees) incurred, claimed or sustained by third parties, including but not limited to Advertisers, directly or indirectly as a result of (a) Publisher's breach of or non-compliance with this Agreement, (b) Publisher's violation of any law, or an alleged violation of law by CJ, that is a direct or indirect result of Publisher's use of the Network Service, (c) Publisher's use of the Network Service, (d) Publisher's participation in any Program, (e) any content, goods or services offered, sold or otherwise made available by Publisher to any person, (f) Publisher's acts or omissions in using, displaying or distributing any internet links obtained from the Network Service or elsewhere, including but not limited to Publisher's use of internet links via email distribution, (g) any claim that CJ is obligated to pay tax obligations in connection with payment made to Publisher pursuant to this Agreement and/or any Advertiser's Program, and (h) any violation or alleged violation by Publisher of any rights of another, including breach of a person's or entity's intellectual property rights (each (a)-(h) individually is referred to hereinafter as a "Claim"). Should any Claim give rise to a duty of indemnification under this Section 8, CJ shall promptly notify Publisher, and CJ shall be entitled, at its own expense, and upon reasonable notice to Publisher, to participate in the defense of such Claim.  Participation in the defense shall not waive or reduce any of Publisher's obligations to indemnify or hold CJ harmless.  Publisher shall not settle any Claim without CJs prior written consent.  Publisher also shall indemnify for any reasonable attorneys' fees or other costs incurred by an indemnified party in investigating or enforcing this Section 8. In the context of this Section 8 only, the term "CJ" shall include officers, directors, employees, corporate affiliates, subsidiaries, agents, and subcontractors.

9.  Miscellaneous.

(a)  Headings and References. Headings of Sections are for the convenience of reference only. Words indicated in quotes and capitalized signify an abbreviation or defined term for indicated words or terms, including those definitions contained in the opening paragraph

(b)  Third Party Disputes. In the event of a third party claim against either: (a) CJ's intellectual property; or (b) against CJ's right to offer any service or good on CJ's Web site(s) or if, in CJ's opinion, such a claim is likely, CJ shall have the right, at its sole option and in its sole discretion, to (i) secure the right at CJ's expense to continue using the intellectual property or good or service; or (ii) at CJ's expense replace or modify the same to make it non-infringing or without misappropriation.

(c)  Relationships of Parties/Third Party Rights. The relationships of the parties to this Agreement shall be solely that of independent contractors, and nothing contained in this Agreement shall be construed otherwise. Nothing in this Agreement or in the business or dealings between the parties shall be construed to make them joint venturers or partners with each other. Neither party shall do anything to suggest to third parties that the relationship between the parties is anything other than that of independent contractor. You agree that Your consent is not necessary to modify any Advertiser Service Agreement.

(d)  Choice of Law/Attorneys' Fees. This Agreement is governed by the laws of the State of California (USA), except for its conflict of law provisions. The exclusive forum for any actions related to this Agreement shall be in the state courts, and, to the extent that federal courts have exclusive jurisdiction, in Los Angeles, California. The parties consent to such venue and jurisdiction and waive any right to a trial by jury. The application of the United Nations Convention on the International Sale of Goods is expressly excluded.  A party that primarily prevails in an action brought under this Agreement is entitled to recover from the other party its reasonable attorneys fees and costs. CJ controls and operates its Web site from its offices in the USA and access or use where illegal is prohibited.

(e)  Force Majeure. Neither party shall be liable by reason of any failure or delay in the performance of its obligations hereunder for any cause beyond the reasonable control of such party, including but not limited to electrical outages, failure of internet service providers, default due to Internet disruption (including without limitation denial of service attacks), riots, insurrection, acts of terrorism, war (or similar), fires, flood, earthquakes, explosions, and other acts of God.

(f)  Severability/Waiver. If any provision of this Agreement is held by any court of competent jurisdiction to be illegal, null or void or against public policy, the remaining provisions of this Agreement shall remain in full force and effect. The parties shall in good faith attempt to modify any invalidated provision to carry out the stated intentions in this

Agreement. The waiver of any breach of any provision under this Agreement by any party shall not be deemed to be a waiver of any preceding or subsequent breach, nor shall any waiver constitute a continuing waiver.

(g) **Assignment and Acknowledgement.** Neither party may assign this Agreement without the prior express written permission of the other party. Notwithstanding the foregoing, Your consent shall not be required for assignment or transfer made by CJ (1) due to operation of law, or (2) to an entity that acquires substantially all of CJ's stock, assets or business, or (3) to a related entity (e.g. parent or subsidiary of parent). Your use of the Network Service is irrefutable acknowledgement by You that You have read, understood and agreed to each and every term and provision of this Agreement. CJ may establish from time to time rules and regulations regarding use of the Network Service as published on the Network Service and incorporated herein.

(h) **Marketing.** Publisher agrees that CJ may identify it as a CJ Publisher in client lists and may use Publisher's name and/or logo solely for such purpose in its marketing materials. Any other uses of Publisher's name and/or logo not otherwise described or contemplated herein shall require Publisher's prior written consent.

(i) **Entire Agreement, Assignment and Amendment.** This Agreement, including the Introduction, contains the entire understanding and agreement of the parties and there have been no promises, representations, agreements, warranties or undertakings by either of the parties, either oral or written, except as stated in this Agreement. This Agreement may only be altered, amended or modified by an instrument that is assented to by each party to this Agreement by verifiable means, including without limitation by written instrument signed by the parties or through a "click through" acknowledgement of assent. No interlineations to this Agreement shall be binding unless initialed by both parties. Notwithstanding the foregoing, CJ shall have the right to change, modify or amend ("Change") this Agreement, in whole or in part, by posting a revised Agreement at least 14 days prior to the effective date of such Change. Your continued use of the Network Service after the effective date of such Change shall be deemed Your acceptance of the revised Agreement.

COMMISSION JUNCTION, INC.
530 East Montecito Street
Santa Barbara, CA 93103 USA
a Delaware Corporation, EIN#41-41-1922033

"You":_____

Address:_____

_____

By:_____

By:_____

Name:_____

Name:_____

Title:_____

Title:_____

Date:_____

Date:_____

Federal ID # (or Company Reg. No.):_____

# EXHIBIT "B"

# Alyson Emmer

| | |
|---|---|
| **From:** | Peter Bexelius |
| **Sent:** | Wednesday, June 27, 2007 6:41 PM |
| **To:** | todd@dunningmarketing.com |
| **Subject:** | Kessler's Flying Circus - wiring instructions |
| **Attachments:** | Kesslers ltr_Final.doc |

Hi Todd:

Further to our conversation, this is the letter I referred to. I appreciate your understanding in this matter. As we discussed, please wire us the funds ($565,517.84) less your wiring fee, tomorrow morning at your convenience. If you could kindly call me at (805-450-6126) and email to confirm once done, I'd greatly appreciate it.


Below are the payment instructions for wire payment:

Wire Payment Information
| | |
|---|---|
| Beneficiary: | Commission Junction |
| Bank: | Wells Fargo Bank |
| Address: | 420 Montgomery Street |
| | San Francisco, |
| | CA 94104 |
| Account No: | 4121196406 |
| Routing No: | 121 000 248 |
| Swift Code: | BIC WFBIUS6S |


Thanks again for your cooperation and understanding!


Cheers,


Peter Bexelius
Account Manager - Strategic Accounts

Commission Junction, a ValueClick Company
530 East Montecito Street
Santa Barbara, CA 93103
Direct: 805 730 8106
Fax: 805 730 8458
Email: pbexelius@cj.com

*Any disclosure, copying, distribution, posting or use of the contents of this information is prohibited and may be unlawful. This e-mail may contain proprietary or confidential information and is for the sole use of the intended recipient(s). Thank you.*

8/2/2007

June 27, 2007

Mr. Brian Dunning
Mr. Todd Dunning
Kessler's Flying Circus
15 High Blf.
Laguna Niguel, CA 92677

Re: Kessler's Flying Circus—CID 1558264

On June 20, 2007, following initial approval by your firm's advertiser, eBay Inc., Commission Junction issued a US Direct Deposit payment of $565,517.84 to your checking account number as logged in our Commission Junction Marketplace ("CJM") system. After this payment was processed by us, we were requested by eBay to suspend payouts to various publishers, including your firm, pending a review of your potentially questionable activity in CJM for the month of May.

Accordingly, we have attempted to recall the direct deposit transaction through the banking system, but have been unsuccessful in completing the recall transaction due to insufficient funds in your bank account described above.

We request your immediate cooperation by facilitating our recall of $565,517.84 from your bank account to avoid the potential initiation of alternative actions to recall such funds.

Remittance instructions:

By mail to:

Commission Junction
#774140
4140 Solutions Center
Chicago, IL 60677-4001

Or by wire to:

Routing number: 121000248
Account number: 4121196406

Please contact Peter Bexelius at (805) 730-8106 if you require additional information.

Sincerely,

Commission Junction, Inc.

## PROOF OF SERVICE

STATE OF CALIFORNIA )
) ss.
COUNTY OF LOS ANGELES )

I am employed in the County of Los Angeles, State of California. I am over the age of 18 years and not a party to the within action. My business address is 70 South Lake Avenue, Suite 750, Pasadena, California 91101.

On May 16, 2008, I served the foregoing document described as **SECOND AMENDED SUMMONS AND COMPLAINT FOR DAMAGES** by placing a true copy thereof enclosed in sealed envelopes addressed as follows:

Stewart H. Foreman, Esq.
Freeland Cooper & Foreman LLP
150 Spear Street, Suite 1800
San Francisco, California 94105
Telephone: (415) 541-0200
Facsimile: (415) 495-4332
*Attorney for Defendants, TODD DUNNING and KESSLER'S FLYING CIRCUS*

Scott Patrick Barlow, Esq.
General Counsel
30699 Russell Ranch Road, Suite 250
Westlake Village, California 91362
Telephone: (818) 575-4500
Facsimile: (818) 575-4501
*Co-counsel for Plaintiff COMMISSION JUNCTION INC.*

Ronald Rus, Esq.
Leo J. Presiado, Esq.
Rus, Miliban & Smith
2600 Michelson Drive
Irvine, California 92612
Telephone: (949) 752-7100
Facsimile: (949) 252-1514
*Attorney for Defendant, BRIAN DUNNING and THUNDERWOOD HOLDINGS, INC.*

(X) **BY MAIL**      I caused such envelope(s) to be deposited in the mail at Pasadena, California. The envelope was mailed with postage thereon fully prepaid. I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. It is deposited with the U.S. Postal Service on that same day in the ordinary course of business. I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than one (1) day after date of deposit for mailing in affidavit. I am a resident or employed in the county where the mailing occurred. The envelope or package was placed in the mail at Pasadena, California, 91101.

This document was produced on paper purchased as recycled.

(X)      STATE I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on May 16, 2008, at Pasadena, California.

Marta I. Rincon
—————————————————
Marta I. Rincon

SECOND AMENDED COMPLAINT FOR DAMAGES

**RECEIVED**

MAY 1 9 2008

RUS, MILLIBAND & SMITH

EXHIBIT "9"

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name and Address)*: | TELEPHONE NO.: | FOR COURT USE ONLY |
|---|---|---|
| John H. Ernster, SBN 59338<br>Phil J. Montoya, Jr., SBN 124085<br>Ernster Law Offices, P.C.<br>70 So. Lake Avenue, Suite 750<br>Pasadena, California 91101 | 626-844-8800 | |

ATTORNEY FOR *(Name)*:  Plaintiff, Commission Junction, Inc

Insert name of court and name of judicial district and branch court, if any:
Orange County Superior Court
Central Justice Center

PLAINTIFF/PETITIONER: COMMISSION JUNCTION, INC.

DEFENDANT/RESPONDENT: THUNDERWOOD HOLDINGS, INC. dba
KESSLER'S FLYING CIRCUS; TODD DUNNING; etc.

| **REQUEST FOR DISMISSAL** | CASE NUMBER: |
|---|---|
| [ ] Personal Injury, Property Damage, or Wrongful Death<br> [ ] Motor Vehicle   [ ] Other<br> [ ] Family Law<br> [ ] Eminent Domain<br> [X] Other *(specify)*: Breach of Contract | 30-2008 00101025 |

- A conformed copy will not be returned by the clerk unless a method of return is provided with the document. -

1. TO THE CLERK: Please dismiss this action as follows:
 a. (1) [X] With prejudice   (2) [ ] Without prejudice
 b. (1) [ ] Complaint   (2) [ ] Petition
   (3) [ ] Cross-complaint filed by *(name)*:                    on *(date)*:
   (4) [ ] Cross-complaint filed by *(name)*:                    on *(date)*:
   (5) [X] Entire action of all parties and all causes of action
   (6) [ ] Other *(specify)*:*

Date: March 23, 2009

Phil J. Montoya, Jr.
_____
(TYPE OR PRINT NAME OF  [X] ATTORNEY  [ ] PARTY WITHOUT ATTORNEY)

\* If dismissal requested is of specified parties only of specified causes of
action only, or of specified cross-complaints only, so state and identify
the parties, causes of action, or cross-complaints to be dismissed.

Ernster Law Offices
▶ *(signature)*
(SIGNATURE)
Attorney or party without attorney for: Commission
Junction, Inc.
[X] Plaintiff/Petitioner   [ ] Defendant/Respondent
[ ] Cross-complainant

2. TO THE CLERK: Consent to the above dismissal is hereby given.**
Date: March 23, 2009

Patrick K. McClellan
_____
(TYPE OR PRINT NAME OF  [X] ATTORNEY  [ ] PARTY WITHOUT ATTORNEY)

** If a cross-complaint or Response (Family Law) seeking affirmative relief is on
file, the attorney for cross-complaint (respondent) must sign this consent
consent if required by Code of Civil Procedure section 581(i) or (j).

▶ *(signature)*
(SIGNATURE)
Attorney or party without attorney for: Kessler's
Flying Circus
[ ] Plaintiff/Petitioner   [ ] Defendant/Respondent
[X] Cross-complainant

*(To be completed by clerk)*
3. [ ] Dismissal entered as requested on *(date)*:
4. [ ] Dismissal entered on *(date)*:                    as to only *(name)*:
5. [ ] Dismissal not entered as requested for the following reasons *(specify)*:

6. [ ] a. Attorney or party without attorney notified on *(date)*:
   b. Attorney or party without attorney not notified. Filing party failed to provide
   [ ] a copy to conform   [ ] means to return conformed copy

Date: _____   Clerk, by _____, Deputy

Form Adopted for Mandatory Use
Judicial Council of California
CIV-110 [Rev. January 1, 2007]

**REQUEST FOR DISMISSAL**

Legal
Solutions
Plus

Page 1 of 1
Code of Civil Procedure, § 581 et seq.;
Cal. Rules of Court, rule 3.1390

STATE OF CALIFORNIA )
                   ) ss.
COUNTY OF LOS ANGELES )

    I am employed in the County of Los Angeles, State of California. I am over the age of 18 years and not a party to the within action. My business address is 70 South Lake Avenue, Suite 750, Pasadena, California 91101.

    On March 24, 2009, I served the foregoing document described as **REQUEST FOR DISMISSAL** by placing a true copy thereof enclosed in sealed envelopes addressed as follows:

Stewart H. Foreman, Esq.
Freeland Cooper & Foreman LLP
150 Spear Street, Suite 1800
San Francisco, California 94105
Telephone: (415) 541-0200
Facsimile: (415) 495-4332
*Attorney for Defendant, TODD DUNNING*

Ronald Rus, Esq.
Leo J. Presiado, Esq.
Rus, Miliban & Smith
Von Karman Towers, Seventh Floor
2211 Michelson Drive
Irvine, CA 92612
Telephone: (949) 752-7100
Facsimile: (949) 252-1514
*Attorney for Defendant, BRIAN DUNNING and THUNDERWOOD HOLDINGS, INC.*

Patrick Kelly McClellan, Esq.
Von Karman Towers
2211 Michelson Drive, Seventh Floor
Irvine, California 92612
Telephone: (949) 752-7100
Facsimile: (949) 252-1514
*KESSLER'S FLYING CIRCUS and DUNNING ENTERPRISE, INC*

(X) **BY MAIL**      I caused such envelope(s) to be deposited in the mail at Pasadena, California. The envelope was mailed with postage thereon fully prepaid.
    I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. It is deposited with the U.S. Postal Service on that same day in the ordinary course of business. I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than one (1) day after date of deposit for mailing in affidavit. I am a resident or employed in the county where the mailing occurred. The envelope or package was placed in the mail at Pasadena, California, 91101.
This document was produced on paper purchased as recycled.

(X)    STATE I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on March 24, 2009, at Pasadena, California.

                                  Marta I. Rincon

1

**RECEIVED**

MAR 2 7 2009

RUS, MILIBAND & SMITH

*Cronster Law Offices*
A Professional Corporation
70 South Lake Avenue, Suite 750
Pasadena, California 91101

Hasler
03/24/2009
US POSTAGE

FIRST-CLASS MAIL

$00.42⁰

ZIP 91101
011D10600619

Ronald Rus, Esq.
Leo J. Presiado, Esq.
Rus, Miliban & Smith
Von Karman Towers, Seventh Floor
2211 Michelson Drive
Irvine, CA 92612

EXHIBIT "10"

<u>SETTLEMENT AND MUTUAL GENERAL RELEASE AGREEMENT</u>

THIS SETTLEMENT AND MUTUAL GENERAL RELEASE AGREEMENT (the "Settlement Agreement") is made and entered into as of this 9th day of March, 2009, by and between Kessler's Flying Circus, a general partnership ("KFC"), Thunderwood Holdings, Inc., a California corporation ("THI"), and Brian Dunning, an individual (collectively, "KFC Parties") on the one hand, and Commission Junction, Inc., a Delaware corporation ("CJI") on the other hand. The parties identified in this paragraph will sometimes collectively be referred to as the "Parties" or each as a "Party." This Agreement is entered into with reference to the following facts:

## <u>RECITALS</u>

A. On January 4, 2008, CJI commenced an action in the Superior Court of the State of California for the County of Orange against KFC, THI, Brian Dunning and Todd Dunning entitled *Commission Junction, Inc. v. Thunderwood Holdings, Inc., dba Kessler's Flying Circus; Todd Dunning; Brian Dunning and DOES 1 through 50*, Orange County Superior Court Case No. 30-2008 00101025 (the "Action"). CJI filed its First Amended Complaint in this Action on March 13, 2008 adding Dunning Enterprise, Inc., a California corporation ("DEI") as a party defendant. CJI filed its Second Amended Complaint in the Action on May 15, 2008. The Second Amended Complaint alleges causes of action for Breach of Contract, Open Book Account, Account Stated, Reasonable Value, Conversion, Unfair Competition and Declaratory Relief.

B. Each of the KFC Parties have answered the Second Amended Complaint and generally deny each and every allegation stated therein.

C. On July 25, 2008, KFC filed its Cross-Complaint for, *inter alia,* Breach of Contract in the Action against CJI (the "Cross-Complaint"). CJI has answered the Cross-Complaint and generally denies each and every allegation stated therein.

D. The Parties now wish to settle all claims alleged against one another, without admission of liability, fault or wrongdoing, including those alleged in the Action on the terms and conditions set forth below.

NOW, THEREFORE, in consideration of the above premises, the mutual promises and covenants contained below, and for such other good and valuable consideration, the receipt and sufficiency of which is acknowledged, the Parties agree as follows:

## <u>AGREEMENT</u>

1. <u>Payment to CJI</u>. KFC shall pay to CJI, the total principal amount of Twenty-Five Thousand Dollars ($25,000.00) in currency of the United States (the "Settlement Amount"). The Settlement Amount shall be paid within ten (10) days of the execution of this Settlement Agreement.

2.     Dismissal of the Action. The Action shall be dismissed with prejudice against the KFC Parties within ten (10) days of the execution of this Settlement Agreement.

3.     Dismissal of the Cross-Complaint. The Cross-Complaint shall be dismissed with prejudice against CJI within ten (10) days of the execution of this Settlement Agreement.

4.     Release by CJI. With the exception of the obligations of the KFC Parties under this Agreement, CJI, together with their principals, agents, attorneys, representatives, subsidiaries, parents, assigns, successors, and predecessors (the "CJI Releasors") hereby absolutely, fully and forever releases, relinquishes and discharges the KFC Parties, together with their principals, agents, attorneys, representatives, subsidiaries, parents, assigns, successors, and predecessors (the "KFC Releasees") from any and all claims, debts, actions, obligations, liabilities, demands, damages, losses, costs, attorneys' fees, interests and expenses of any kind or nature, character and description, whether known or unknown, whether suspected or unsuspected, whether fixed or contingent, which the CJI Releasors have held or now hold against the KFC Releasees arising from or related to the Action or any claim which could have been alleged in the Action, or otherwise arising from or related to the relationship between the CJI Releasors and the KFC Parties, from the beginning of time to the date of execution of this Agreement (the "CJI Released Claims"). The CJI Releasors acknowledge that they have been advised by legal counsel and are familiar with the provisions of California Civil Code Section 1542, which provides as follows:

> "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED SETTLEMENT WITH THE DEBTOR."

The CJI Releasors, being aware of this code section, expressly waive to the maximum extent permissible under the law, any rights they may have thereunder, as well as under any other statutes or common law principles of similar effect.

5.     Release by KFC. With the exception of the obligations of the CJI Parties under this Agreement, KFC, together with their principals, agents, attorneys, representatives, subsidiaries, parents, assigns, successors, and predecessors (the "KFC Releasors") hereby absolutely, fully and forever releases, relinquishes and discharges the CJI Parties, together with their principals, agents, attorneys, representatives, subsidiaries, parents, assigns, successors, and predecessors (the "CJI Releasees") from any and all claims, debts, actions, obligations, liabilities, demands, damages, losses, costs, attorneys' fees, interests and expenses of any kind or nature, character and description, whether known or unknown, whether suspected or unsuspected, whether fixed or contingent, which the KFC Releasors have held or now hold against the CJI Releasees arising from or related to the Action or any claim which could have been alleged in the Action, or otherwise arising from or related to the relationship

between the KFC Releasors and CJI, from the beginning of time to the date of execution of this Agreement (the "KFC Released Claims"). The KFC Releasors acknowledge that they have been advised by legal counsel and is familiar with the provisions of California Civil Code Section 1542, which provides as follows:

> "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED SETTLEMENT WITH THE DEBTOR."

The KFC Releasors, being aware of this code section, expressly waive to the maximum extent permissible under the law, any rights they may have thereunder, as well as under any other statutes or common law principles of similar effect.

6. **No Admission of Liability.** The Parties acknowledge and stipulate that this Agreement is executed in settlement and compromise of disputed claims and that nothing in this Agreement shall be construed as an admission of any wrongdoing, fault, violation of the law or liability of any kind by any party to this Settlement Agreement.

7. **Successors.** This Agreement shall be binding upon and inure to the benefit of the successors, heirs and assigns of each of the Parties.

8. **Execution of Further Documents.** Following the execution of this Agreement, the Parties shall take such action and execute and deliver such further documents as may be reasonably necessary or appropriate to effectuate the intention of this Agreement.

9. **Applicable Law.** This Agreement is made in, and shall be governed, construed and enforced under the laws of the State of California.

10. **Attorneys' Fees.** If any Party brings suit or any other proceeding arising out of or under this Agreement, including without limitation any such suit or proceeding to enforce or interpret any provision of this Agreement, the prevailing Party shall be entitled to recover its reasonable attorneys' fees in addition to all other costs allowed by law.

11. **Entire Agreement.** This Agreement constitutes the entire understanding and agreement of the Parties with respect to the subject matter hereof, and it supersedes and replaces all prior negotiations, proposed agreements and agreements, written or oral. This is an integrated agreement. Each of the Parties acknowledges that no other Party, nor any agent, representative or attorney of any other Party, has made any promise, agreement, covenant, representation or warranty whatsoever, express or implied, concerning the subject matter of this Agreement that is not contained in this Agreement.

12. **Amendment.** This Agreement may not be modified, amended, supplemented or terminated, and no provision of this Agreement shall be waived, except by a writing executed by all Parties to this Agreement.

13. **Advice of Counsel.** In executing this Agreement, the Parties acknowledge that they have consulted with and have had the advice and counsel of attorneys licensed to practice law in California, and that they have executed this Agreement after independent investigation and without fraud, duress or undue influence.

14. **Prior Review of the Agreement.** Each Party acknowledges that this Agreement has been fully read, reviewed and understood by its authorized signatory.

15. **Execution in Counterparts.** The Parties agree that this Agreement may be executed in counterparts and that it is the intent of the Parties that the copy signed by a Party will be fully enforceable against such Party.

16. **Headings.** The headings contained in this Agreement have been inserted for convenience only and in no way define or limit the scope or interpretation of this Agreement.

17. **Interpretation.** The Parties acknowledge and agree that each has been given the opportunity to independently review this Agreement with legal counsel. In the event of an ambiguity in or dispute regarding the interpretation of same, the interpretation of this Agreement shall not be resolved by any rule of interpretation providing for interpretation against the party who causes the uncertainty to exist or against the draftsman.

18. **Facsimile or Electronic Signatures.** The signature of a Party on this Agreement or on any document authorized or related to this Agreement which is transmitted by facsimile or electronically shall have the same force and effect as an original signature.

19. **Authority of Signatories.** Each person signing this Agreement on behalf of a Party, Releasor and/or Releasee represents and warrants to the other Party, Releasor and/or Releasee that such person has the authority to execute and bind the Party, Releasor and/or Releasee on whose behalf such signatory is signing and that no other person or entity is required to sign this Agreement to make the Agreement fully enforceable against and binding upon such Party, Releasor and/or Releasee.

20.  Counterparts.  This Agreement may be executed in separate counterparts and each counterpart, when executed, shall have the same effect of a signed original.

**PLEASE READ THIS DOCUMENT CAREFULLY.  THIS SETTLEMENT AGREEMENT INCLUDES A RELEASE OF ALL KNOWN AND UNKNOWN PAST CLAIMS.**

IN WITNESS WHEREOF, the Parties execute this Agreement and make it effective as of the date first above written.

COMMISSION JUNCTION, INC.,
a Delaware corporation

By: _____
SCOTT BARLOW
Its:  Vice President

THUNDERWOOD HOLDINGS, INC.,
a California corporation

By: _____
BRIAN DUNNING
Its:  President

_____
BRIAN DUNNING, an individual

KESSLER'S FLYING CIRCUS,
a general partnership

By: THUNDERWOOD HOLDINGS, INC.,
a California corporation, General Partner

By: _____
BRIAN DUNNING
Its:  President

By: DUNNING ENTERPRISE, INC.,
a California corporation, General Partner

By: _____
TODD DUNNING
Its:  President

EXHIBIT "11"

| | |
|---|---|
| **From:** | Phil Montoya [Montoya@ernsterlaw.com] |
| **Sent:** | Wednesday, October 22, 2008 3:44 PM |
| **To:** | Stewart Foreman; Leo J. Presiado |
| **Cc:** | Marine Kaladjian |
| **Subject:** | CJI v. Kessler's |

Stewart and Leo,

This is to inform you that my client CJI does not object to your use and/or filing of the documents listed in your respective letters of today. If you plan to use the documents outside of the pending United States District Court (eBay case) or the Orange County Superior Court (CJI case) matters, please let me know. Thank you.

This will also confirm that no ex parte proceeding will take place on Friday, October 24, 2008 unless I am informed, in writing, of your intention to go forward notwithstanding this notice regarding the identified documents.

Phil J. Montoya, Jr., Esq.
Ernster Law Offices, P.C.
Montoya@ernsterlaw.com
Telephone: (626) 844-8800
Facsimile: (626) 844-8944